ESCALLIER, APPELLANT, *v.* GREAT NORTHERN RY. CO. ET AL., RESPONDENTS.

(No. 3,172.)

(Submitted September 19, 1912. Decided October 23, 1912.)

[127 Pac. 458.]

*Personal Injuries — Railroad Crossings — Declarations of Deceased Persons— Witnesses— Impeachment— Nonsuit— Scintilla of Evidence—Insufficiency.*

Declarations of Deceased Persons—Character of Evidence.
 1. Statements as to declarations or admissions made by another are the weakest and least satisfactory character of evidence in persuasive value, and should be received with great caution.

Personal Injuries — Declarations — Witnesses — Impeachment — Nonsuit — When Proper.
 2. Where the only evidence on which plaintiff relied to fix liability upon defendant railway company for the fatal injuries to his son while in the act of passing over a crossing protected by gates was the declaration of deceased that he was crossing the track and that the engine hit him, and the testimony of the witness who picked up the boy and deposed to such declaration was so far impeached by its own inherent improbability that it suggested fabrication, the court properly directed a judgment of nonsuit.

Same—Scintilla of Evidence—Insufficiency.
 3. To justify the submission of a cause to a jury there must be substantial evidence in support of plaintiff's claim—a mere scintilla is insufficient.

*Appeal from District Court, Silver Bow County; John B. Mc-Clernan, Judge.*

ACTION by Frank Escallier against the Great Northern Railway Company and another. Judgment for defendants, and plaintiff appeals from it and an order denying him a new trial. Affirmed.

*Messrs. Nolan & Donovan,* and *Mr. "A. B. Melzner,* for Appellant, submitted a brief; *Mr. T. F. Nolan* argued the cause orally.

May one who is lulled into a feeling of security by the fact that the gates are open and the statutory signals of trains at crossings are not given be charged with contributory negligence, as a matter of law, if he fails to stop, look and listen for danger before making the crossing? The case at bar is distinguished from the *Meehan Case* by three facts: First, the crossing in the case at bar was guarded by gates which were up, and plaintiff was thereby assured that the crossing could be made with safety; second, the deceased was a minor; and third, the view was to some extent obstructed. We respectfully call the court's attention to the rules stated in 33 Cyc. 1028, as applicable to this particular case as distinguished from the rule applicable to accidents at crossings which are not guarded by gates: "Where a railroad company maintains a flagman, gates or other signals or warnings at a railroad crossing, whether voluntarily, or by law or custom, the public generally has a right to presume that these safeguards will be reasonably maintained and attended, and in the absence of knowledge to the contrary, the fact that the gates are open, or automatic bells not ringing, or that the flagman is absent from his post, or, if present, is not giving a warning of danger, is an assurance of safety and an implied invitation to cross upon which a traveler familiar with the crossing may rely and act within reasonable limits, on the presumption that it is safe for him to go on the crossing." (See, also, *Cleveland C. C. & I. Ry. Co.* v. *Schneider,* 45 Ohio St. 678, 17 N. E. 321; *Woehrle* v. *Minnesota Transfer Ry. Co.,* 82 Minn. 165, 52 L. R. A. 348, 84 N. W. 793; *Kane* v. *New York etc. Ry. Co.,* 132 N. Y. 160, 30 N. E. 256; *Garafalo* v. *New York etc. Ry. Co.,* 206 Mass. 539, 92 N. E. 723; *Stegner* v. *Chicago etc. Ry. Co.,* 94 Minn. 166, 102 N. W. 205; *Rademacher* v. *Detroit etc. Ry. Co.,* 158 Mich.

552, 123 N. W. 45; *Antonio etc. Ry. Co.* v. *Votaw* (Tex. Civ.), 81 S. W. 130, 133; 2 Thompson on Negligence, sec. 1613; Elliott on Railroads, sec. 1157.)

A somewhat similar question, to-wit, whether a person crossing a railroad upon a public highway, where a flagman is maintained, upon signal from the flagman to cross may do so relying upon the flagman's assurance that the crossing is safe, without looking or listening for approaching trains, is discussed in a note in 15 L. R. A., n. s., at page 803, and the note-writer states that though the cases diverge upon the question as to how far the party injured may rely upon such assurance, they are, however, uniform in holding that the question of contributory negligence in failing to look and listen is for the jury.  (See, also, *Blount* v. *Grand Trunk Ry. Co.,* 61 Fed. 375, 9 C. C. A. 526; *Central Trust Co.* v. *Wabash etc. Ry. Co.,* 27 Fed. 159; *Indianapolis Union Ry. Co.* v. *Neubacher,* 16 Ind. App. 21, 43 N. E. 576, 44 N. E. 669; *Palmer* v. *New York, C. & H. R. R. Co.,* 112 N. Y. 234, 19 N. E. 678; *Lewis* v. *Railway Co.* (Utah), 123 Pac. 100.)

*Messrs. Veazey & Veazey,* and *Mr. H. C. Hopkins,* for Respondents, submitted a brief; *Mr. I. Parker Veazey, Jr.,* argued the cause orally.

A mere scintilla of evidence does not require, and, indeed, does not justify, the submission of a cause to a jury, and it would have been error in the trial court, in this instance, to have submitted this cause to the jury, even if it were conceded that there was even a scintilla of evidence introduced in support of the pretense in the complaint.  (38 Cyc. 1534; *Pierce* v. *Great Falls & C. R. Co.,* 22 Mont. 445, 56 Pac. 867; *Tudor* v. *N. P. Ry. Co.,* 45 Mont. 456, 124 Pac. 277; *Baltimore & O. R. Co.* v. *State,* 71 Md. 590, 19 Atl. 969; *Ketterman* v. *Tri-Fork Ry. Co.,* 48 W. Va. 606, 37 S. E. 683; *Dunnington* v. *Syfers,* 157 Ind. 458, 62 N. E. 29; *Meyer* v. *Manhattan Ins. Co.,* 144 Ind. 439, 43 N. E. 448; *Hillyer* v. *Dickinson,* 154 Mass. 502, 28 N. E. 905; *Strauss* v. *American Co.,* 134 Mo. App. 110, 114 S. W. 73; *Linkauf* v. *Lombard,* 137 N. Y. 417, 33 Am. St. Rep. 743, 20 L. R. A. 40,

33 N. E. 472; *Schulykill etc. Co.* v. *Munson,* 14 Wall. (U. S.) 442, 20 L. Ed. 867.)

Declarations of a deceased person in a death action are admissible in behalf of a defendant whenever they take the form of admissions or declarations against interest and upon other grounds. They are not admissible on the part of a plaintiff, as such testimony constitutes merely hearsay, and the statements are mere self-serving declarations. (*Daily* v. *New York etc. R. R. Co.,* 32 Conn. 356, 87 Am. Dec. 176; *Chicago etc. Ry. Co.* v. *Becker,* 128 Ill. 545, 15 Am. St. Rep. 144, 21 N. E. 524; *Marshall* v. *Chicago etc. Ry. Co.,* 48 Ill. 475, 94 Am. Dec. 561; *Waldele* v. *New York C. Ry. Co.,* 95 N. Y. 274, 47 Am. Rep. 41; *Johnson* v. *Oregon S. L. R. Co.,* 23 Or. 94, 31 Pac. 283; *Fink* v. *Ash,* 99 Ga. 106, 24 S. E. 976; *East Tennessee R. Co.* v. *Maloy,* 77 Ga. 237, 2 S. E. 941.)

A well-settled doctrine in a case of this kind is that where the evidence shows that, had the deceased looked or listened, he could have seen or heard, it will be presumed either that he did not look and listen, or that, looking and listening, he did not heed what he saw or heard, and, in either case, is guilty of contributory negligence preventing a recovery. (33 Cyc. 1073; *Myers* v. *Baltimore & O. Ry. Co.,* 150 Pa. 386, 24 Atl. 747, 748; *Payne* v. *Chicago etc. Ry. Co.,* 136 Mo. 562, 38 S. W. 308; *Rollins* v. *Chicago etc. Ry. Co.,* 139 Fed. 639, 71 C. C. A. 615; *Shumm's Admr.* v. *Railway Co.,* 81 Vt. 186, 19 L. R. A., n. s., 973, 69 Atl. 946; *Schlimgen* v. *Railway Co.,* 90 Wis. 186, 62 N. W. 1045; *Bressler* v. *Railway Co.,* 74 Kan. 256, 86 Pac. 472; *Teel* v. *Railway Co.,* 49 W. Va. 85, 38 S. E. 518; *Sullivan* v. *Railway Co.,* 175 Pa. 361, 34 Atl. 798; *Caldwell* v. *Railway Co.,* 54 Tex. Civ. 399, 117 S. W. 488; *Buckmaster* v. *Railway Co.,* 108 Wis. 353, 84 N. W. 845; *Smith* v. *Railway Co.,* 141 Ind. 92, 40 N. E. 272; *Pittsburgh etc. Ry. Co.* v. *Fraze,* 150 Ind. 576, 65 Am. St. Rep. 377, 50 N. E. 577; *Clemons* v. *Railway Co.,* 137 Wis. 387, 119 N. W. 105; *Pennsylvania R. Co.* v. *Pfuelb,* 60 N. J. L. 278, 37 Atl. 1101.) This doctrine has been approved also by this court

in the case of *Meehan* v. *Great Northern Ry. Co.*, 43 Mont. 72, 114 Pac. 781.

It is said that where a crossing is protected by gates, and the crossing gates are up, the traveler is thereby lulled into security, and is excused in exercising reasonable care for his own safety. The only question argued by counsel on the motion for a new trial is, therefore, whether the existence of crossing gates in this case made the case one of fact for the jury. In nearly every jurisdiction, in so far as we have been able to ascertain, it is the law that the existence of crossing gates does not excuse the traveler from looking and listening seasonably for the approach of trains before going upon the track, and that, although the gates are up, the traveler is nevertheless under an obligation to exercise reasonable care for his own safety and to look and listen for approaching trains, and that if he does not do so, he is guilty of contributory negligence which will defeat a recovery as in the ordinary case. In such cases, also, the rule applies that where the evidence shows that had the deceased looked or listened he could have seen or heard, it will be presumed that he did not look or listen, or that, looking and listening, he did not heed what he saw or heard. (*Greenwood* v. *Philadelphia W. & B. R. Co.*, 124 Pa. 572, 10 Am. St. Rep. 614, 3 L. R. A. 44, 17 Atl. 188; *Romeo* v. *B. & M. Ry. Co.*, 87 Me. 540, 33 Atl. 24; *Smith* v. *Wabash R. Co.*, 141 Ind. 92, 40 N. E. 270; *Pfuelb* v. *Pennsylvania R. Co.*, 61 N. J. L. 287, 43 L. R. A. 849, 41 Atl. 1116; *Blount* v. *Grand Trunk R. Co.*, 61 Fed. 375, 9 C. C. A. 526; *Boutell* v. *M. C. R. Co.*, 133 Mich. 486, 95 N. W. 568; *Ellis* v. *B. & M. R. Co.*, 169 Mass. 600, 48 N. E. 839; *Smith* v. *Wabash R. Co.*, 141 Ind. 92, 40 N. E. 270; *Rangeley's Admr.* v. *Southern Ry. Co.*, 95 Va. 715, 30 S. E. 386; *Tyler* v. *Old Colony R. Co.*, 157 Mass. 336, 32 N. E. 227.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This is an action by the plaintiff for damages for the death of a son, seventeen years of age, resulting from injuries alleged

to have been caused by a collision with one of defendant company's trains at a street crossing in the city of Butte. The complaint alleges: "Fifth. That on the 11th day of August, 1909, the said Albert Escallier, at about the hour of 10 o'clock in the afternoon of said day, was proceeding along said Talbot avenue, and, while crossing defendant's railroad at said Braund House crossing, was run into and over by one of defendant's trains, consisting of an engine and caboose, and then and there was so injured by said train that he died the next day as the result thereof. That at the time of said accident and injuries aforesaid said defendants were negligently and carelessly running said train at an excessive, high and dangerous rate of speed, towit, about twenty miles an hour. That the defendants carelessly and negligently, as they approached and reached said crossing, omitted to give any signal by ringing the bell or blowing the whistle. That the gates at said crossing were negligently left open. That the defendants negligently failed to give the said Albert Escallier any notice or warning whatever of the approach of said train to said crossing." The defenses tendered by the defendants are a denial that the injury was caused by them, and a plea of contributory negligence on the part of the deceased.

Five witnesses were examined on behalf of plaintiff. The first was the plaintiff himself. He was not present when the accident occurred, and testified only as to the age, habits, *etc.*, of the deceased. The second was the undertaker who officiated at the funeral, and was questioned touching the expense of burial, *etc.* The examination of the third related entirely to the character of the "Braund House" crossing, and to the intelligence and physical condition of the deceased. He did not witness the accident. The fourth witness was the defendant Davis, who was in charge of the train at the time of the accident. He testified that as he approached the crossing his headlight was burning; that there was an arc-light over the crossing; that he was looking out ahead, and that he saw no one on or near the crossing, which, he said, would certainly have been the case had anyone been there. He stated, further, that besides causing the bell to be rung he sounded the whistle because a short distance be-

yond the crossing to one going toward the west—the direction in which he was then going—there was a derailing switch, which, being kept open, barred his passage unless it was closed and signal given of the fact after the whistle had been sounded. He also stated that he approached and passed over the crossing at the rate of four or five miles an hour. He stated that he distinctly recollected the circumstances connected with his passage over the crossing, and detailed them as he remembered them. The fifth witness was one De Long. We quote all the material parts of his testimony:

"I was in the city of Butte on the 11th day of August, 1909. On that evening about the hour of 10 o'clock I was standing on the corner of the platform at 1259 Talbot avenue, which is right close to the Braund House crossing about twenty-five or thirty feet from the crossing. It was either between 10 and 10:20—10:10. I observed an engine and caboose run over that crossing on that evening about that time. As to remembering the injury to Albert Escallier, well, I picked the boy up off the crossing after the train had went through. * * * I think the number of the engine was 1139. Immediately after the engine and caboose went over the crossing, I see the boy there, and went and picked him up just at that time. Then the street-car came down, and a fellow by the name of Matt Benewick helped me pick the boy up, and put him on the platform, and I took my handkerchief and corded him up, and stopped the blood with my handkerchief. At the time the train consisting of the engine and caboose ran over the crossing the gates were up. I didn't hear any engine bell or whistle. That train ran over the crossing between twenty and twenty-five miles an hour. There was nothing wrong with my hearing. If a whistle had been blown, I most assuredly would have heard it, and, if a bell had been rung, I would have heard that. It was about a minute or minute and a half after the engine and caboose ran over the crossing that I saw Albert Escallier. * * * He didn't seem to me to be in very much pain. * * * His leg kind of flopped around. * * * He tried to get up. * * * He couldn't get up on account of his leg being broke. Q. When

you picked the boy up, what did he say to you? A. The boy said: 'I was crossing the track, and the engine hit me.' * * * The boy was found on the saloon side of the railroad track. He was just about halfway between the street-car track and the gate-post, and by 'gate-post' I refer to the gate-post on the north side, or saloon side. * * * I don't know how far that was from the gate-post. I suppose it would be about twenty or thirty feet from the gate-post near the saloon and on the north side of the track, or the right-hand [north] side of the track as you go to Butte.'' The following are portions of his cross-examination: ''As to whether I recall having stated at any time or at any place, in the presence of anybody, that the boy said to me * * * that he had been injured in stepping off from the train and struck something and rolled back; no, sir, he says he got hurt—the engine hit him as he crossed the track. You say you are not asking me now what he said. I don't recall at any time or at any place * * * making statements in the presence of anybody to the contrary of that statement, not that I recollect of. As to whether I ever, at any time or at any place, in the presence of anyone, said that boy told me that he was struck as he stepped off from the train and rolled back, I stated that case to you as the boy told me. Q. I am asking you whether you have stated to anyone, at any time or at any place, that the boy told you that he was injured in stepping off from the train? * * * A. I have told the attorney there that the engine hit the boy; what the boy told me. Q. Now, I am asking you about a fourth time whether, at any time, to anyone, you made any statements to the effect that the boy told you that he was hurt in stepping off from the train? A. Well, I don't recollect of it if I did. I will not say that I didn't because I don't know. As to whether I will not say that I didn't state to other persons that that boy told me that he was injured in stepping off from the train—he was hurt crossing the track is what he told me, see? Q. As I understand you, you don't recall whether or not at any time you stated to anyone that that boy told you that he was hurt in stepping off from the train? A. I did not say I forgot whether I stated that or not. I would have to, I

suppose, recall it; but I didn't say it, see, that I know of. I don't know of having made any such statement that I know of. * * * Q. I am going to ask you whether you will swear positively that you did not make a statement to the effect that the boy had told you that he was injured in jumping off of the train? A. * * * Yes; he was not hurt jumping off the train. I don't know as he jumped off. The Court: That is not the question. A. Well, that is what the boy told me. He got hurt crossing the track, the engine hit him. I do not know that at any time I stated that the boy told me he was hurt in jumping off the train. I do not know that I have ever made any statement of that kind. I don't think I made such a statement. I don't remember anything like that at all, but I can't state positively that I made no such statement of that kind. * * * As to what I was doing at that saloon at that time, I was coming up the street—up to the saloon. I had just got there at that saloon when the train was coming up. I don't know as I had been in the saloon at all. I was with nobody at the time. I suppose I would have went into the saloon if I hadn't been watching the engine. As to where I had come from, I, when I was standing on this saloon corner, I think I had been up in town, I couldn't say where all I had been—around town. I can't state where I was coming from at that time, coming from town. I had been uptown somewheres around there. I was in Butte. As to whereabouts in Butte, I go a good many places around town. I couldn't say exactly where I did come from on that night before I was on this saloon corner. * * * I was going down to this saloon. After that I suppose I would go home and go to bed. On August 11, 1909, I was here in Butte living, but I don't exactly know whereabouts I was living, or in what house, or on what street. I don't know exactly now where I was living. At the time I stood on the corner of that saloon, I intended, after leaving that saloon, to go home and go to bed. I know that I then intended to go home and go to bed. On that evening before I was standing in front of that saloon I think I was up in town. All I can say is that I was coming from somewhere in Butte, up in town. I don't recollect now what

I did after I picked the boy up; went down the street to bed, I guess. I did't pay much attention to it that way, where I went to. I can't tell you in what direction I went in going to bed. As to whether I know along what street I went after the accident—it has been a long time. I have forgotten about it. As to whether I can tell what street or streets I went along after the accident in leaving the Braund House crossing, it would take a long time for me to study it up where I did go. I don't remember where I went. * * * As to how I happen to remember this declaration of this boy to the effect that the engine hit him, when I don't remember these other things, I can remember what a fellow says, what he told me. As to whether I can remember what somebody says better than I can remember where I was going, what I was doing, or where I was living, I can remember that, what he told me. As to how I account for my being able to remember that he used that one word, 'engine,' well, suppose I set it down in a book or on a paper— The Court: Never mind what you suppose. Just answer the question, if you can. A. Well, I can't answer that.'' It may be noted that while the witness was able to understand plaintiff's counsel and answer readily upon direct examination, when it came to the cross-examination, he claimed that he could not understand English, and had to be assisted by an interpreter.

It appears that at the crossing and for a long distance toward the east the railroad is straight, and that trains coming from that direction can readily be seen by a pedestrian approaching the crossing on Talbot avenue, either from the north or south. The saloon referred to by De Long is on the north side of the track and fronts toward the south.

At the close of the plaintiff's evidence, the court directed a judgment of nonsuit. The plaintiff has appealed from the judgment and an order denying his motion for a new trial.

The case alleged in the complaint is that of a person fatally injured by a railroad train while he was in the act of passing over a crossing protected by gates, which had negligently been left open. No one saw the accident. The only evidence upon which plaintiff relies to fix liability upon the defendants is the

testimony of De Long, disclosing the declaration of the deceased at the time he was found lying in the street, a few minutes after the passing of the train, *viz.,* "I was crossing the track and the engine hit me." When this evidence was offered, counsel for defendants objected to it on the ground that the declaration was neither a part of the *res gestae,* nor within any exception to the hearsay rule. They now argue that it should have been excluded on both grounds. We shall not determine this contention, but shall assume, as counsel for plaintiff contend, that it was admissible because not open to objection for either reason urged against it, and that, other considerations aside, when taken in connection with the proof of the injury, the condition of the gates, *etc.,* it made a case for the jury upon the question whether the negligence of the defendants was the proximate cause of the injury.

Speaking generally, this character of evidence is the weakest and least satisfactory of any in persuasive value. "With respect [1] to all verbal admissions, it may be observed that they ought to be received with great caution. The evidence, consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness by unintentionally altering a few of the expressions really used gives an effect to the statement completely at variance with what the party actually did say." (1 Greenleaf on Evidence, 16th ed., sec. 200.) The weakness of this character of evidence is recognized by the statute, and it is thereby made the duty of a trial court on all proper occasions to instruct the jury that it is to be viewed with caution. (Rev. Codes, sec. 8028; *McCrimmon* v. *Murray,* 43 Mont. 457, 117 Pac. 73.) It is a quality which attaches to all oral testimony as to declarations or admissions which are relevant to the issues on trial, and are competent because they are against the interest of the party making them or fall within some other rule of admissibility. Though the witness who testifies to the oral statement may be honest, his memory may be at fault, or he may

have failed to comprehend and interpret the statement as it was intended to be understood by the speaker. In case it was involuntary, as here, he may not recall the words used, and in endeavoring to relate what he heard, give the statement a meaning which the words actually used did not import. Moreover, so easy is it to fabricate such evidence that there is strong temptation to a dishonest, interested witness to do so. (17 Cyc. 806, and notes.) After enumerating these elements of weakness, the author of the article in Cyc. on this subject, at page 808, remarks: "Exposed to all the infirmities just mentioned is the testimony to oral statements of dead men, which is invariably subjected to the closest scrutiny in view of the impossibility in most cases of convicting the witness of perjury if his testimony is willfully false." He then proceeds to enumerate the circumstances which have been noticed by the courts as tending to impair the credibility of such testimony. Among these are the following: "That the testimony is improbable in view of other facts in the case; that the alleged statement is inconsistent with proved facts in the case, absurd, or demonstrably false; that the statement is not in harmony with the conduct of the witness or of the declarant, or that it conflicts with the declarant's statements to other persons at other times; that the witness is uncorroborated by any independent circumstance in the case; that the witness  *  *  *  is grossly ignorant, or has slight appreciation of the force of words and little skill in expressing in his own language what others have said; that better and available evidence to prove the fact admitted in the alleged statement is not produced;  *  *  *  that other persons present when the alleged statement was made are not produced nor their absence accounted for; that witnesses testifying to the statement are interested parties or otherwise biased; that the alleged statement was made in the presence of the witness alone;  *  *  *  that the memory of the witness is in a confused condition;  *  *  *  that discrepancies in the examination of the witness in chief and his cross-examination, although immaterial, betray inaccuracy or confusion of memory; that the witness' testimony is loose, uncertain, and contradictory;  *  *  *  that

the manner of the witness does not inspire confidence; that the witness is unable to locate definitely the time of the conversation, * * * nor how he happened to come in contact with the declarant on the occasion; that the witness pretends to repeat verbatim a casual conversation after many years; * * * that the credibility of the witness is seriously impaired by other parts of his testimony; that the witness is seriously discredited as to part of his testimony by the opposing testimony of several witnesses. * * * "

These observations are pertinent here. Assuming that the declaration was made by the deceased as stated by De Long, [2] the case was left to go to the jury upon the bare inference that the deceased, having observed the condition of the gates, was thrown off his guard and went upon the crossing without taking the precaution of looking and listening and stopping for this purpose, if necessary, which, under other conditions, he would have been required to do. (*Hunter* v. *Montana C. Ry. Co.*, 22 Mont. 525, 57 Pac. 140.) De Long's statement, when subjected to analysis in the light of the testimony of the engineer and the circumstances attending the accident, is impeached in so many particulars that in our opinion it should not be regarded as of any persuasive value. He was watching the engine; yet he failed to state that he saw the deceased until after the train had passed. From his position he must have had a clear view, for it is not disputed that the headlight of the engine was burning and that there was an arc-light over the crossing. He stated that neither the bell nor whistle was sounded. In this he is flatly contradicted by the engineer, who was positive that both signals were given, predicating his statement both upon his personal recollection of the incident and the conditions rendering it imperative that he sound the whistle. This evidence tends to show that the deceased was not on the crossing, and therefore that he could not have made the statement. At least one other person, Benewick, was present when the declaration was made by the deceased. Though he must have been cognizant of all that transpired, he was not called as a witness nor was his absence accounted for. De Long is contradicted by

the engineer as to the rate of speed at which the train was going. His memory is so defective as to render his story improbable. While recalling the declaration so distinctly that he was able to say that the deceased used the word "engine," he could not recall where he came from to the place of the accident, how he happened to be there, or where he went after he and Benewick picked up the deceased. He did not remember even where he was living or where he slept that night. It is apparent, too, from his cross-examination that he was inclined to be impudent to counsel, and was uncertain as to whether he had not given different versions of the incident to other persons at other times. A witness who is desirous of telling the truth cannot have any uncertainty as to the version of the same story given by him at different times. On the whole, his story, as it is presented in the printed record, is so far impeached by its own inherent improbability, in view of the other circumstances admitted or proven, that it suggests fabrication. Furthermore, the trial judge had an opportunity to observe his manner and conduct. This is always an important element to be given weight by a trial court, and if the manner and conduct of the witness, added to other matters of impeachment, so far destroy his credit as to render his testimony too unsubstantial to support a verdict, a trial judge is justified in refusing to submit the case to the jury; for, though the general rule is that on a motion for nonsuit the evidence of the plaintiff is regarded as proving every [3] material fact which it tends to prove, there must be substantial evidence—more than a mere scintilla—in order to justify a verdict. (*Pierce* v. *Great Falls & C. Ry. Co.*, 22 Mont. 445, 56 Pac. 867; *Tudor* v. *Northern Pac. Ry. Co.*, 45 Mont. 456, 124 Pac. 276.) This rule obtains where the evidence is in such a condition that, if the case should be submitted to the jury and a verdict for the plaintiff returned, it would be the duty of the court to set it aside. (*Pierce* v. *Great Falls & C. Ry. Co., supra; Bean* v. *Missoula Lumber Co.*, 40 Mont. 31, 104 Pac. 869; *Gunther* v. *Liverpool Ins. Co.*, 134 U. S. 110, 33 L. Ed. 857, 10 Sup. Ct. Rep. 448; *Schofield* v. *Chicago etc. Ry. Co.*, 114 U. S. 615, 29 L. Ed. 224, 5 Sup. Ct. Rep. 1125; *Ketterman* v. *Dry Fork*

*R. Co.*, 48 W. Va. 606, 37 S. E. 683; *Dunnington* v. *Syfers*, 157 Ind. 458, 62 N. E. 29; *Linkauf* v. *Lombard*, 137 N. Y. 417, 33 Am. St. Rep. 743, 20 L. R. A. 48, 33 N. E. 472; *Simmons* v. *Chicago R. Co.*, 110 Ill. 340; *Hillyer* v. *Dickinson*, 154 Mass. 502, 28 N. E. 905; *Connor* v. *Giles*, 76 Me. 132; 6 Ency. of Pl. & Pr. 678.) In the case last cited it is said: "The old rule that a case must go to the jury if there is a scintilla of evidence has been almost everywhere exploded. There is no object in permitting a jury to find a verdict which a court would set aside as often as found. The better and improved rule is, not to see whether there is any evidence, a scintilla, a crumb, dust of the scales, but whether there is any upon which a jury can, in any justifiable view, find for the party producing it, upon whom the burden of proof is imposed." Whether there is any substantial evidence in the case made by the party upon whom the burden rests is always a question of law. If there is not, the court ought to withdraw the case from the jury and direct judgment. (Rev. Codes, sec. 6761.) If the testimony of De Long is excluded, there is no fact shown justifying an inference that the deceased was injured by collision with the engine. As counsel for the defendants suggest, he may have been injured in an attempt to jump from the train, or by some other means with which defendants were not in any way concerned. But, be the fact as it may, a verdict for plaintiff upon the evidence before us could not have been sustained. The action of the district court was proper.

The judgment and order are affirmed.

*Affirmed.*

MR. JUSTICE HOLLOWAY concurs.

MR. JUSTICE SMITH, being absent, did not hear the argument, and takes no part in the foregoing decision.