HJERMSTAD, Appellant, *v.* BARKULQO, Respondent.
No. 9206.
Submitted January 6, 1954. Decided May 21, 1954.
270 Pac. (2d) 1112.

Messrs. Hall, Alexander and Burton and Mr. John H. Kuenning, Great Falls, for appellant.

Mr. H. R. Eickemeyer, Messrs. Jardine, Chase and Stephenson, Great Falls, Messrs. Loble and Loble and Mr. Gene A. Picotte, Helena, for respondent.

Mr. Edward C. Alexander, Mr. H. C. Hall, Mr. Lester H. Loble and Mr. Picotte argued orally.

MR. JUSTICE FREEBOURN:

This is an action to have a warranty deed, wherein plaintiff and appellant, S. L. Hjermstad, and his wife, as parties of the first part, conveyed certain real property in Great Falls, Montana, to defendant and respondent, Laura Lee Barkuloo, as party of the second part, declared a mortgage.

The trial court in its judgment found that plaintiff had failed to prove the allegations of his complaint, and ordered the ''case be dismissed and that defendant have judgment against the plaintiff for her costs * * *''.

From such judgment Hjermstad appealed.

The pleadings and undisputed evidence show that the real property here involved, residential property in Great Falls, Montana, was deeded on February 10, 1944, by Cecil A. Kirk and wife to Sigurd L. Hjermstad, plaintiff and appellant.

Further, that on February 14, 1944, the said property was deeded by Hjermstad and his wife to Laura Lee Barkuloo, defendant and respondent and the wife of Ray G. Barkuloo. It is

this deed, a warranty deed, which is sought to be declared a mortgage.

Also that, on February 14, 1944, a written instrument, a lease, was signed by Laura Lee Barkuloo, as lessor, and S. L. Hjermstad, as lessee, whereby the said real property was leased to Hjermstad for one year "beginning at noon February 15th, 1944, and ending at noon on February 15th, 1945, and thereafter from year to year unless and until cancelled and terminated by either party giving to the other party notice in writing not less than thirty days prior to February 15th of any year of his desire to cancel and terminate" such lease.

The lease further provided that the "Lessee agrees to pay to Lessor as rental for the premises hereby leased the sum of Seven Hundred Eighty and no/100 Dollars ($780.00) per year, payable in monthly installments of Sixty-five Dollars ($65.00)."

Such lease further provided that the lessor should pay for the water used, taxes and insurance, and that "This lease is given by the Lessor subject to the sale of the premises described at any time, but the Lessee shall have an option to buy the said premises at the same price and on the same terms as might be acceptable from any other bona fide purchaser."

In other respects the terms of the lease are very similar to the terms of leases commonly used in connection with the leasing of residential property.

It is clear from a reading of the lease and the warranty deed of February 14, 1944, that neither the deed nor the lease contained any words, statements or provisions suggesting that such deed is in fact a mortgage.

According to the amended complaint and evidence of Hjermstad the said deed and lease do not mean what they say.

The complaint avers, and Hjermstad's evidence pretty well follows such averments, that Hjermstad borrowed the money, $8,500, from Ray G. Barkuloo, with which the property was purchased from the Kirks, under an oral agreement whereby the lease was required as a bonus for the advancement of such money and was to be for two years only; and that such lease was

to provide that at the end of such two years Hjermstad and his wife "would execute a mortgage upon the property to defendant to secure the payment to her of the full sum of $8,500.00, said sum to be repaid to defendant by plaintiff in monthly installments over a 15 year period with interest at the rate of four per cent per annum."

It is further alleged in the complaint that "after * * * the sum of $8,500.00 was advanced and loaned * * * and said sum was paid to the said C. H. Kirk," and after the Kirks had deeded the property to Hjermstad, "Ray G. Barkuloo presented the plaintiff with an instrument partially completed which was in form a warranty deed [the deed of February 14, 1944, from the Hjermstads to Laura Lee Barkuloo] but which he [Ray G. Barkuloo] advised plaintiff would be the mortgage between the parties * * *".

The complaint further alleges that "The plaintiff and his wife, having implicit confidence in the said Ray G. Barkuloo, and upon the understanding aforesaid signed the partially completed instrument" and delivered it to Barkuloo; "That thereupon the said defendant, without the knowledge or consent of plaintiff or his wife fraudulently caused to be inserted in said instrument" a description of the property and "No revenue stamps required as the consideration paid is the amount shown herein; the Grantors acting as agent for Grantee herein in purchase of the property."

Continuing, the complaint avers that: "Some weeks later the said Ray G. Barkuloo, ostensibly acting for and on behalf of defendant * * * presented to plaintiff a lease [the lease dated February 14, 1944] covering said premises, which said Barkuloo assured plaintiff was in accordance with the aforesaid agreement between plaintiff and himself and defendant. That relying upon the statements of said Ray G. Barkuloo, as aforesaid, plaintiff signed said lease without reading same." That "Within a short time thereafter plaintiff discovered that there was no provision in said lease or otherwise whereby at the expiration of two years, or as of February 15, 1946, the mortgage would

be in effect and that payments made from and after that date would apply on said mortgage and that at the end of 15 years the mortgage would be paid in full. The plaintiff thereupon demanded of the said Ray G. Barkuloo that the lease be changed to accord with the agreement of the parties, as aforesaid. The said Ray G. Barkuloo thereupon advised plaintiff that he had nothing to worry about, but that if the plaintiff so desired the lease would be changed to accord with the agreement between the parties and that he would see that the matter was attended to within the next few days. Plaintiff relied upon the promises of said Ray G. Barkuloo and for the time being took no steps to void or reform said deed or lease.

"The plaintiff not having heard further from the said Ray G. Barkuloo called the office of Ray G. Barkuloo on innumerable occasions but found that Barkuloo was out of the city. At intervals for the next six months the plaintiff tried to contact the said Ray G. Barkuloo but it was not until the 11th of December, 1944, that the plaintiff finally was able to converse with the said Ray G. Barkuloo * * * whereupon the said Ray G. Barkuloo again promised the plaintiff that the lease would be corrected so as to be in accord with the agreement as originally made and the said Ray G. Barkuloo requested that the plaintiff should call at his office on Saturday morning, December 16th, 1944, at 9 o'clock A. M., at which time such corrected lease executed by defendant would be delivered to plaintiff. On the 14th day of December, 1944, the said Ray G. Barkuloo was killed in an automobile accident * * *".

Defendant, by answer, admits: The execution and existence of the deeds and lease described in the complaint; that Ray G. Barkuloo was killed in an automobile accident on December 14, 1944; that plaintiff paid the rental in accordance with the terms of the lease; that she paid all taxes and insurance on the property, and denied all other material allegations of the complaint; and set up several separate defenses to the cause of action alleged in the complaint.

The evidence shows that plaintiff is state agent for the "Amer-

ica Fore'' Group Insurance Company, at Great Falls, Montana, and had been such since June 1, 1941, and that Ray G. Barkuloo was one of his agents. As plaintiff said, ''he was an agent of ours.''

It was in Barkuloo's office, where plaintiff had gone on a ''matter in connection with the Maryland Fire Insurance Company'', that Barkuloo asked plaintiff ''who owned the home that we were living in, and I said 'C. H. Kirk at Butte, Montana.' 'How much rent are you folks paying out there,' he said. I said, '$65.00 a month.' He said, 'Is that house for sale?' I said, 'It is for sale to my wife and I, and I have just a few days to raise $8,500.00 so I can buy it, and if I don't buy it, there's another individual in Great Falls, that will buy it.' ''

The above conversation is the first that was had as between plaintiff and Ray G. Barkuloo concerning the purchase of said real property, in which plaintiff and his wife were living as tenants of Kirk.

Such conversation would indicate, if the warranty deed and lease speak the truth, that it would be a reasonable proposition that Barkuloo buy the property, for in that event plaintiff and his wife could go on renting the property at the same rental, whereas if ''another individual'' bought it, they would have to move. The testimony showing:

''Q. Had the property been sold to some other person, Mr. Hjermstad, what would have happened to you and your family? A. We would have had to find another place to live.

''Q. And what was the situation here in Great Falls at that time with reference to finding another place to live? A. Very bad. * * *

''Q. What do you mean by 'very bad'? A. It was very difficult to find a suitable place.''

It was, therefore, to plaintiff's interest that the deal, as indicated by the warranty deed and lease, be made.

Certain it is, as shown by Plaintiff's own testimony, that he did not approach Barkuloo, in the first instance, to seek a loan so he could buy the property for himself, but that the purchase

of the property was initially and first broached by Barkuloo, whose words then spoken leave the impression that Barkuloo was then interested in buying the property.

The evidence shows that Hjermstad was 55 years of age, with a high school and college education; that he started in the insurance business in 1920; that for three years he "was inspector for the Northwestern Association of Companies inspecting rain insurance"; that he "was special agent for the North British and Mercantile Insurance Companies in the City of Minneapolis from June 14, 1923, until May 1, 1926"; that from 1926 to 1932 he was special agent in Minneapolis for the "American Fore" Insurance Group; and was in charge of the Fargo, North Dakota, headquarters for the same group from 1932 to 1934, when he came to Great Falls.

When agent for the "Association of Companies" his work was "supervisory, inspection work, production work and collections. * * * Assisting other agents to solicit large policies and I would call to help close the deal * * * adjusted lots of losses * * * checking the contract to see if there is coverage. Then, you have to figure what the loss amounts to." At the present time "I have charge of the State of Montana for all operations of the Group except the hail department * * *. Fire and automobile and marine and farm. * * * Q. How many agents do you have operating under you in the State of Montana? * * * A. Approximately two hundred. Q. And you oversee all of these agents on this business? A. Yes, sir."

The evidence shows that Mrs. Hjermstad and plaintiff had been married for 27 years; that she had a high school education, and "went to LaCrosse State Teachers College two years. * * * I taught two years at Redwing, Minnesota, and I taught some time in Minneapolis, Minnesota; and I am doing that now— substitute teaching."

In speaking of the warranty deed which plaintiff brought home for her to sign she testified:

"It wasn't a deed; it was a blank piece of paper.

"Q. What was it? A. I don't know.

"Q. Was there anything on the paper at all? A. I didn't see anything. I didn't look for any printing. He told me to sign and I signed * * *

"Q. When you signed, did he lay the paper before you? A. Yes.

"Q. And you mean to say that you didn't see anything on the paper at all? A. No I didn't look for anything.

"Q. Did you look to see if it was a mortgage or a deed? A. I didn't; he [her husband—the plaintiff] told me it was a mortgage. * * *

"Q. You didn't look for yourself? A. No, I didn't.

"Q. Were the blanks filled in or were they not? A. No.

"Q. How could you tell if you didn't look at it? A. Well, we discussed it. * * *

"Q. You weren't curious about it to find out what it was all about? A. The paper itself, no. I merely trusted Mr. Hjermstad and when he said for me to sign, I signed it.

"Q. And you did not know that that instrument was a deed until 1946? A. That's right, June, 1946."

Plaintiff testified concerning the signing of the warranty deed, as follows: That Barkuloo handed the deed to him saying: " 'You and your wife sign this first mortgage and bring it back * * *.' He said it was to be a first mortgage for fifteen years. * * * I took it home that noon, and my wife and I signed it where he told us to sign. * * * There was nothing printed on this when my wife and I signed it. * * * I mean, it wasn't filled in in the open blanks. * * * Q. Did you read the paper which was presented to you by Mr. Barkuloo? A. I did not."

On cross-examination plaintiff testified that, when handed the deed by Barkuloo, "I opened it and I said, 'What's going in each of these parts here?' * * * Q. Well, when you opened it up, you saw what the instrument was, didn't you? A. Yes, but I didn't pay any attention to anything on it. * * * Q. Well, you took the instrument home? A. Yes, sir."

Plaintiff was home "possibly thirty or forty-five minutes." There he told his wife:

" 'We are going to sign the mortgage * * *'.

"Q. You told her that's what this instrument was? A. Yes, sir; * * *.

"Q. What did she say? A. She said, 'What's going to be put in here?' * * * A. She pointed to this instrument here [indicating]. Well, I said, 'There is to—there is going to be 180 items' * * *.

"Q. Did she ask you anything about, or tell you that she noticed that this was a warranty deed? A. No, sir. * * *

"A. I told her it was a mortgage. * * *

"Q. And you signed it? A. Yes, sir. * * * I signed it in the house. * * *

"A. As soon as I finished my signature [she signed it]. * * *

"A. She asked me what was going to go in there. * * *

"A. I took it back to the office. * * * I asked Mr. Christensen and Mrs. Sloan [in his office] if they would be witnesses to our signatures. * * *

"A. I asked them if they would be witnesses to our signatures —my wife's and my signature, and I asked Mrs. Sloan if she would take the acknowledgment. * * *

"Q. Now, will you look at the back of this exhibit—did you see Mrs. Sloan [the Notary Public] acknowledge that? A. Yes, sir.

"Q. Is that her signature? A. Yes, sir.

"Q. Did she sign that before you? A. My recollection is that she did.

"Q. And do you know whether or not she did any typewriting on that acknowledgment? A. I don't believe she did. * * *

"Q. Then, she did write something in there while you were there? A. I imagine she did.

"Q. Now, the deed then was in your possession from about 11:30 until after 1:00 o'clock? A. The blank instrument was in my possession."

The signing of the warranty deed was no rush act on the part of plaintiff and his wife, and it is hard to conceive how a person as smart and intelligent as plaintiff, with his years of

experience in handling insurance policies and other written instruments, would sign a written instrument, in the honest belief that it was a mortgage, when it so plainly and obviously appeared upon its face to be a warranty deed.

The deed, at the time it was signed by plaintiff, declared in printed words "that the said parties of the First Part, for and in consideration of the sum of ............................................ Dollars, ($.........................................) lawful money of the United States of America to ............................................ in hand paid by said part...... of the Second Part, the receipt whereof is hereby acknowledged; do...... by these presents grant, bargain, sell, convey, warrant and confirm unto the said part...... of the Second Part, and to ...................... heirs and assigns forever, the hereinafter described real estate situated in the City and town of ...................................., County of ........................................, and State of Montana, towit: .............................................''

Then followed the blank space, where the description and reference to no revenue stamps were said to have been inserted later in typewriting. Following this came at least thirteen lines of printing containing, among other things, "and the said parties of the First Part * * * will forever Warrant and Defend all right, title and interest in and to the said premises * * *''.

All of the above printing appeared on the same side of the instrument and above the lines where plaintiff and his wife signed such instrument. Anyone signing such instrument could not help seeing the printing and just a casual scanning of the print would disclose that the instrument was a deed and not a mortgage. No one could see the blank space without seeing the print, above and below such space. On the other side of the instrument in letters three-eighths of an inch high appear the words "Warranty Deed."

As to the lease of five pages plaintiff testified: That he signed it, but "I did not" read it before signing. He claimed it was signed "three or four weeks" after he signed the deed, although the deed and lease are both acknowledged before notary publics on the same date, February 14, 1944.

On cross-examination plaintiff testified that he signed the lease when "Ray said, 'you sign here,' and I signed there. Q. No one prevented you from looking at the lease? A. That's right. Q. Or reading it? A. No, sir."

Although plaintiff claimed the lease was not what it should be he continued paying the rent as provided by its terms.

Usually a note showing the principal amount of the indebtedness is made the basis of a mortgage. None was signed here. Plaintiff testified: "Q. Did you ever sign any note payable either to Ray G. Barkuloo or Laura Lee Barkuloo? A. No, sir."

It is the general rule that a party will not be relieved, either by a court of equity or a court of law, where he executes an instrument without reading it, when he has it in his hands and negligently fails to ascertain the contents of it; the other party not being guilty of any deceit or false representation as to its contents, by means of which he is put off his guard. Wilcox v. Schissler, 55 mont. 246, 175 Pac. 889.

However in Grindrod v. Anglo-American Bond Co., 34 Mont. 169, 85 Pac. 891, 894, this court said: "When it appears that a party, who claims to have been deceived to his prejudice, has investigated for himself, or that the means were at hand to ascertain the truth or falsity of any representations made to him, his reliance upon such representations, however false they may have been, affords no ground of complaint. Pierce v. Ten-Eyck, 9 Mont. [349], 353, 23 Pac. 423; McCormick v. Hubbell, 4 Mont. [87], 99, 5 Pac. 314 (and other cases cited.)"

In McCormick v. Hubbell, cited above, this court said [4 Mont. 87, 5 Pac. 315]:

"To this action the defendants, the sureties upon the undertaking aforesaid, in their answer, set up * * * that Young and her attorneys induced and procured these defendants to sign said undertaking by false and fraudulent representations * * *.

"The third defense, that Young and her attorney falsely represented that the undertaking these defendants were about to sign was conditioned for the payment of the costs only in case judgment was rendered against Young in the district court, is

wholly insufficient. The undertaking with all its conditions was before the defendants. They had it in their hands, and an opportunity to examine it. If, by their own ngelect or carelessness, they failed to do so, it is their own fault. If they were ignorant of the law on the subject, that does not excuse them. Mere verbal representations of what a written contract contains when the same is in the hands of the party to be bound, if he signs it, do not affect the liability of such party.''

Plaintiff was certainly guilty of neglect of duty, if as he said, he did not read the deed or the lease before signing.

As said in Hennessy v. Holmes, 46 Mont. 89, 125 Pac. 132.

''There can scarcely be any question that failing to read carefully a written instrument before uttering the same is a neglect of a legal duty. * * *

''In 1 Daniel on Negotiable Instruments, sec. 849, it is said: 'If a party who can read a deed put before him for execution, or if, being unable to read, will not demand to have it read and explained to him, he is guilty of supine negligence, which, I take it, is not the subject of protection, either in equity or in law, and ordinarily, in the absence of any device to put the party off his guard, an omission to read the instrument, by one having the capacity to do so, will render him liable and put him beyond the protection of the law, although he is assured he is signing a paper of a different kind from what it really is.' See, also, Herman on Estoppel & Res Adjudicata, vol. 2, sec. 1004.''

17 C. J. S., Contracts, sec. 137, p. 487, holds ''As a general rule a person cannot avoid a written contract into which he has entered on the ground that he did not attend to its terms, that he did not read the document which he signed, that he supposed it was different in its terms, or that it was a mere form, and this doctrine has been affirmed by numerous courts quoting and citing Corpus Juris with approval on such well settled rule.''

Plaintiff charged actual fraud on the part of Barkuloo, and the burden of establishing such fact was on plaintiff.

''Actual fraud is always a question of fact'', R. C. M. 1947, sec. 13-310, ''and the burden of proof is upon the one who

alleges it.'' Lee v. Stockmen's National Bank, 63 Mont. 262, 207 Pac. 623, 630; Lindsay v. Kroeger, 37 Mont. 231, 95 Pac. 839.

Fraud cannot be presumed, but must be proven by satisfactory evidence. Teisinger v. Hardy, 86 Mont. 180, 282 Pac. 1050.

Plaintiff bases his case almost entirely upon the oral statements alleged to have been made to him by Barkuloo, now dead.

The declarations of Barkuloo were admissible under R. C. M. 1947, sec. 93-401-10, but, as said in Gray v. Grant, 62 Mont. 452, 206 Pac. 410, 418, ''testimony of this character is not satisfactory, and should be received and weighed with caution''. See also Roy v. King's Estate, 55 Mont. 567, 179 Pac. 821.

Speaking of the declarations of deceased persons, Chief Justice Brantly, in Escallier v. Great Northern Ry., 46 Mont. 238, 127 Pac. 458, 461, said: ''Speaking generally, this character of evidence is the weakest and least satisfactory of any in persuasive value. * * * After enumerating these elements of weakness, the author of the article in Cyc. [17 Cyc. 806] on this subject, at page 808, remarks: 'Exposed to all the infirmities just mentioned is the testimony to oral statements of dead men, which is invariably subjected to the closest scrutiny in view of the impossibility in most cases of convicting the witness of perjury if his testimony is willfully false.' He then proceeds to enumerate the circumstances which have been noticed by the courts as tending to impair the credibility of such testimony. Among these are the following: 'That the testimony is improbable in view of other facts in the case; that the alleged statement is inconsistent with proved facts in the case, absurd, or demonstrably false; that the statement is not in harmony with the conduct of the witness or of the declarant, or that it conflicts with the declarant's statements to other persons at other times; that the witness is uncorroborated by any independent circumstance in the case; * * * that the alleged statement was made in the presence of the witness alone; * * * that the manner of the witness does not inspire confidence; that the witness is unable to locate definitely the time of the conversation, * * * that the

witness pretends to repeat verbatim a casual conversation after many years; * * *' ''.

It is our duty in equity cases and in matters and proceedings of an equitable nature to "review all questions of fact arising upon the evidence presented in the record * * * and determine the same, as well as questions of law * * *''. R. C. M. 1947, sec. 93-216.

This we have done, but having done so we find nothing in the evidence that would cause us to reverse or change the judgment as rendered by the district court, which heard and observed the witnesses upon the stand, and could determine from the attitude, demeanor and appearance of such witnesses where credibility should lie.

As pointed out before, plaintiff was guilty of negligence in not, as he says, reading the deed and lease. It is hard for us with only the cold record before us to believe that he, with his education and experience, in the quiet of his own home, with the warranty deed lying upon the table to be signed by himself and his wife, did not read such instrument, did not see the printed matter upon it, and did not see the words "Warranty Deed" upon it. Surely when his wife noticed the blank space, between the printing, on the side of the deed they were signing and pointed to it and said "What goes in here" or in substance that his eyes were not closed to what was before him.

It is not reasonable to believe that a man of plaintiff's education and experience, during the more than nine months between the reading of the lease and Barkuloo's death, would not have commenced legal action to reform such lease, or at least have consulted a lawyer in the matter.

The reading of the lease should have made plaintiff suspicious of Barkuloo, if what plaintiff says is true, and should have dispelled any confidence he might have had in Barkuloo or his word. There was nothing to stop plaintiff from interviewing a lawyer in the matter. The money had been paid to the Kirks and Barkuloo could not recall it, and at the same time Barkuloo had no club over plaintiff by virtue of being his superior officer,

the reverse being true, since Barkuloo was but one of two hundred agents under plaintiff's supervision.

Under the law and the evidence in this case, it is hard to see how the trial court could have come to any other conclusion than it reached.

We have examined the other assignments of error but find no merit in them.

For reasons stated the judgment of the district court is affirmed.

MR. CHIEF JUSTICE ADAIR, and MR. JUSTICES BOTTOMLY, ANGSTMAN, and ANDERSON, concur.