## LEE, APPELLANT, *v.* STOCKMEN'S NATIONAL BANK ET AL., RESPONDENTS.

(No. 4,722.)

(Submitted April 17, 1922.   Decided May 8, 1922.)

[207 Pac. 623.]

*Fraud—Sale of Chattel Mortgages—Burden of Proof—Prima Facie Case—Insufficiency—Nonsuit.*

Fraud—Question of Fact—Burden of Proof.
 1.  In an action based on fraud, the question whether actual fraud has been practiced is one of fact, and the burden of proof is upon him who alleges it.

Same—*Prima Facie* Case—Essential Facts Necessary to be Shown.
 2.  To make out a *prima facie* case of fraud sufficient to go to the jury, the plaintiff must show a false representation by defendant, its materiality and defendant's knowledge of its falsity or ignorance of its truth, his intent that it should be acted upon by plaintiff in the manner reasonably contemplated, his reliance upon its truth, his right to rely thereon, and his consequent and proximate injury.

Same—When Action not Maintainable.
 3.  Where it appears in an action for fraud that plaintiff had investigated or had the means at hand to investigate the truth of an alleged false representation, his reliance upon it affords no ground for complaint.

Nonsuit—When Proper.
 4.  A judgment of nonsuit is proper where the plaintiff fails to prove a case for the jury, and when no substantial evidence has been introduced by the party upon whom rests the burden of proof, a question of law for the decision by the court is presented.

Fraud—Sale of Chattel Mortgages—*Caveat Emptor*—Evidence—Insufficiency—Nonsuit Proper.
 5.  Under the above rules, *held* that a judgment of nonsuit was properly entered in an action against a bank for damages claimed to have been suffered by plaintiff in reliance upon alleged fraudulent representations made to him by its cashier that mortgages held by it on automobiles handled by a dealer were in full force, had not been paid, *etc.,* whereas in fact the bank had authorized the mortgagor to sell, and who had sold them, paying the proceeds into the bank, and on the strength of which statements plaintiff had bought the mortgages, where it appeared from plaintiff's evidence that he was a director of the bank and a member of its discount committee, with knowledge of the course of business pursued between the bank and the mortgagor with relation to the automobiles, had himself indorsed the

---

 1.  Burden of proof as to fraud, see notes in 1 **Ann. Cas.** 809; Ann. Cas. 1912A, 711.
 3.  General rule of right to rely upon representations where defrauded party has means of knowing truth, see notes in **Ann. Cas.** 1915B, 779; 37 **L. R. A.** 597.

mortgagor's notes secured by mortgaged cars which were sold by the latter notwithstanding the mortgage, *etc.*, it appearing therefrom that any damage he suffered was not traceable to the alleged false representations but to his failure to exercise the care imposed by the rule of *caveat emptor.*

*Appeals from District Court, Big Horn County; A. C. Spencer, Judge.*

ACTION by Walter O. Lee against the Stockmen's National Bank of Hardin and another. From a judgment for defendants and from an order denying his motion for a new trial, plaintiff appeals. Affirmed.

*Messrs. McIntire & Murphy* and *Messrs. Quinn & Maddox,* for Appellant, submitted an original and a reply brief; *Mr. H. G. McIntire* argued the cause orally.

The grounds for the motion for nonsuit are to the effect that appellant had the means of ascertaining the falsity of respondents' misrepresentations, and not having used such means was not in position to complain. This, in other words, may be paraphrased, that if one believes another, and so believing relies and acts on his statements, he cannot complain if he failed to ascertain from other independent sources that his informant was lying to and deceiving him. It is hardly necessary to say that such a doctrine is ethically unsound, and it is apparent further that if it be true, then it negatives the fundamental essential principle that in order to recover because of misrepresentations, there must be both pleaded and proven the fact that the misrepresentations were relied on. We contend that in such cases as the present one the underlying principle is whether the plaintiff acted as a reasonably prudent person in relying on the statements alleged and proved, and its corollary that if reasonable minds might differ as to that question, it becomes a matter for the jury to decide, and it is error to deprive a plaintiff of this right by a nonsuit.

The warning, *caveat emptor,* which is the only justification for the ruling here complained of, has lost most of its potency, and is being more and more criticised and discredited in recent years. Many cases in support of this assertion might be cited, but we shall refer to but a few of them. (See *Prescott* v. *Brown,* 30 Okl. 428, 120 Pac. 991; *Foote* v. *Wilson,* 104 Kan. 191, 178 Pac. 430, 431; *Aiken* v. *Bjorkvig,* 77 Or. 397, 150 Pac. 278, 280; *Speed* v. *Hollingsworth,* 54 Kan. 436, 38 Pac. 496–498; *Lentz* v. *Landers,* 21 Ariz. 117, 185 Pac. 823; *Teague* v. *Hall,* 171 Cal. 668, 154 Pac. 851; Pomeroy's Equity Jurisprudence, sec. 896.) Under the above cases, whether the appellant exercised the diligence of an ordinarily prudent man in relying on the fraudulent representations independent of a research as to their falsity "is a question within the peculiar province of the jury." (*Fargo etc. Co.* v. *Fargo etc. Co.,* 4 N. D. 219, 37 L. R. A. 593–615, 59 N. W. 1066; *Gee* v. *Moss,* 68 Iowa, 318, 27 N. W. 268; *Banta* v. *Savage,* 12 Nev. 151, 7 Morr. Min. Rep. 113; *Schwabacker* v. *Riddle,* 99 Ill. 343; see, also, *Wilcox* v. *Schissler,* 55 Mont. 246, 175 Pac. 89; *Buhler* v. *Loftus,* 53 Mont. 546, 165 Pac. 601; *Koch* v. *Rhodes,* 57 Mont. 447, 188 Pac. 933; *Como etc. Co.* v. *Markham,* 54 Mont. 438, 171 Pac. 274.)

That an officer of the bank dealing with the bank is not chargeable with uncommunicated knowledge of the bank's affairs, see 3 R. C. L., Banks., secs. 87, 107. A bank is chargeable with the deceit and fraud of an officer acting in the apparent scope of his authority. (See 3 R. C. L., Banks, sec. 86.)

*Mr. C. F. Gillette* and *Mr. E. E. Enterline,* for Respondents, submitted a brief; *Mr. Enterline* argued the cause orally.

All of the cases cited by opposing counsel merely sustain the holding of this court in the case of *T. C. Power & Bro.* v. *Turner,* 37 Mont. 521, 97 Pac. 950, wherein the rule is announced: "When it appears that a party who claims to have been deceived to his prejudice has investigated for him-

self, or that the means were at hand to ascertain the truth or falsity of any representation made to him, his reliance upon such representations, however false they may have been, affords no ground of complaint." (*Pierce* v. *Ten Eyck,* 9 Mont. 349, 23 Pac. 423; *Grimrod* v. *Anglo-American Bank,* 34 Mont. 169, 85 Pac. 891; *Lukert* v. *Eldridge,* 49 Mont. 46, 139 Pac. 999; *Como Orchard Land Co.* v. *Markham,* 54 Mont. 438, 171 Pac. 274.)

Even though we accept as true the statement that Garvey told appellant that none of the property had been released we must accept as true the testimony of the appellant and his witness, Waddell, that Garvey told them the arrangement with Smith was that he, Smith, was to sell the mortgaged property and account to the bank for the proceeds, and further, that appellant had knowledge that Smith was selling the mortgaged property in the regular course of his business. Under these circumstances there could be no actionable fraud, for at most it would be a misrepresentation of a matter of law. (*Stevens* v. *Curran,* 28 Mont. 366, 72 Pac. 753; *Rocheleau* v. *Boyle,* 11 Mont. 451, 28 Pac. 872; *Wilson* v. *Vioghat,* 9 Colo. 614, 13 Pac. 726; *Lewiston Nat. Bank* v. *Martin,* 2 Idaho, 734, 23 Pac. 920; *Ryan* v. *Rogers,* 14 Idaho, 309, 94 Pac. 427.)   That there is a waiver of the lien of the mortgage as a result of the mortgagee's consent to sell is elementary. (*New England Mortgage Security Co.* v. *Great Western Elevator Co.,* 6 N. D. 407, 71 N. W. 130; *Maier* v. *Freeman,* 112 Cal. 8, 53 Am. St. Rep. 151, 44 Pac. 357.)   It is generally held that the consent of the mortgagee that the mortgagor may sell the mortgaged property given upon the agreement that the mortgagor will apply the proceeds to the mortgage amounts to a substitution of the personal promise of the mortgagor in lieu of the mortgage security. (*White Mountain Bank* v. *West,* 46 Me. 15; *Smith* v. *Crawford County State Bank,* 99 Iowa, 282, 61 N. W. 378, 68 N. W. 690; *Smith* v. *Clark,* 100 Iowa, 605, 69 N. W. 1011; *Carr* v. *Brawley,* 34 Okl. 500, 43 L. R. A. (n. s.) 302, 125 Pac. 1131;

*Laughlin* v. *Larson,* 27 S. D. 376, 131 N. W. 305; *Minneapolis Threshing Machine Co.* v. *Calhoun,* 37 S. D. 542, 159 N. W. 127.) And although such conditions were entered into or permitted in good faith, nevertheless, when all conditions are shown, the question arises whether or not the parties fulfilled the law in making the mortgage, and this is a question of law. (*Rocheleau* v. *Boyle,* 11 Mont. 451, 28 Pac. 872.) A misrepresentation as to a matter of law, made by a vendor as an inducement to the sale, is regarded as an expression of opinion which naturally does not constitute actionable fraud. (20 Cyc. 54.)

MR. JUSTICE GALEN delivered the opinion of the court.

This is an action to recover damages for alleged false and fraudulent representations made to plaintiff by the defendant relied upon by the plaintiff, as a result of which he was induced to purchase from the defendant at face value two overdue promissory notes executed by one Thomas C. Smith, secured by chattel mortgages on certain automobiles, aggregating in amount $3,366.35. Seven thousand dollars are claimed as actual and $2,000 as exemplary damages. Upon issues joined, the cause was tried before a jury. At the conclusion of plaintiff's case, defendants moved the court for a nonsuit, which was granted, and judgment thereupon entered for defendants, with their costs. The appeal is from the judgment, and from the order denying plaintiff's motion for a new trial.

But one question is presented decisive of the case, *viz.:* Did the court err in granting a nonsuit?

It appears that one Thomas C. Smith was, on January 1, 1918, indebted to the plaintiff in the sum of $1,606 and interest, represented by two promissory notes past maturity; that the plaintiff had on that date commenced action to recover thereon, in which an attachment issued and levy was attempted to be made upon certain automobiles covered by two chattel mortgages of record, executed by Smith as mortgagor, in favor of the defendant bank, mortgagee. In an effort to pro-

tect his demand and secure payment thereof, the plaintiff went to the defendant bank, paid off the amount of Smith's indebtedness to the bank, aggregating $3,366.35, and the notes and chattel mortgages securing the same were thereupon assigned and delivered to the plaintiff. At the time of this transaction, the plaintiff was accompanied by his attorney, John L. Waddell, and the sheriff, John Kifer. The business was conducted by the defendant Garvey as cashier of the bank, in the presence of the attorney and the sheriff, indorsements being made by the attorney. Thereupon the sheriff was given the mortgages and directed by the plaintiff to foreclose on the automobiles therein described, under a power of sale contained in the mortgages.

In several instances the sheriff took from the possession of persons claiming ownership by purchase from Smith, automobiles covered by said chattel mortgages, resulting in actions in claim and delivery, all of which terminated adversely to the plaintiff. See the case of *Luther* v. *Lee,* 62 Mont. 174, 204 Pac. 365. In this action plaintiff seeks actual damages for loss of the amount paid to the bank by him in exchange for the Smith notes and chattel mortgages, the amount of Smith's independent indebtedness to the plaintiff, and for the expenses and costs incurred by him in litigation in an endeavor to recover the property covered by such mortgages. By way of proof of the alleged fraud and misrepresentation, it appears that the defendant Garvey, acting as the agent of the defendant bank, represented to the plaintiff, at and before the purchase by him of Smith's notes and the chattel mortgages securing the same, that such mortgages were in full force and effect; that none of the property described therein had been released or discharged from the liens of the same, and that they were unpaid and undischarged. Plaintiff was one of the organizers of the defendant bank, its vice-president, and a member of its board of directors and loan committee.

The plaintiff Lee testified on direct examination, in part, as follows: "C. T. Garvey was engaged in business in Hardin,

Montana, on the twenty-first day of January, 1918, as cashier
of the Stockmen's National Bank, and also as a director. He
has been cashier of that bank since the bank opened, I think
the 5th of September, 1917; I am not positive. C. T. Garvey
was in charge of the business of that bank at the time it
opened on January 21, 1918. As to whether he had full
charge of all the business transacted there, I thought he had.
He had as far as I was concerned. When Mr. Garvey was
there, he had charge of the windows and moneys in making
loans. * * * I had talked to Mr. Garvey about the in-
debtedness of Thomas C. Smith to me on these two notes.
* * * Q. And just state to the jury what Mr. Garvey ad-
vised you and told you to do. A. Why, Mr. Garvey and I
talked this over several times, but a day or two before that
he advised me to take up this mortgage and foreclose on it.
As to the substance of what Mr. Garvey told me, it would be
hard to say. I talked it over with Mr. Garvey and asked
him if he had ever given any consent to sell any of these cars,
to release any of them. I refer to the cars mentioned in this
mortgage, Ford cars and Buicks. Mr. Garvey told me with ref-
erence to taking up these mortgages: 'That is a good way for
you to get even, and also save the bank foreclosing on it.'
He says: 'You have got to do it.' He says: 'That is the way
for you to get your money.' He says, 'There is plenty there
to pay the bank, to take up these mortgages,' and to pay
me part anyway. I was to be paid by foreclosing on this
mortgage, taking the cars, and selling them. Attachment was
discussed by me and him at that time. I asked him how
much there was due on it at the time, and he told me
how much there was and how much stuff there was. * * *
And to what was said by Garvey to me as to how I was
to proceed to get the money on these cars and the mort-
gage, he just advised me to take up this mortgage and fore-
close on them, foreclose on the mortgage. "Q. Anything said
about an attachment suit? A. Yes. Well, there was quite
a little said at the time, but he advised me to take up this

[63 Mont. 262.]

mortgage at the bank and attach these cars and foreclose this mortgage. There was quite a little said. After I had this talk with Garvey, I had other talks with him. Q. Before you took up the mortgages? A. Well, I would say there for two days, every time we would meet, that was about all we would talk about. I think Mr. Waddell was with me at one time when I had subsequent talks about taking up this mortgage. Mr. Waddell at that time asked Mr. Garvey if he had ever given any permission to sell these cars. I think the date of that was * * * the morning of the 21st. That was the time that I made the payment to the bank, the afternoon of the 21st. Mr. Garvey was there with me and Waddell at the time Waddell asked this question. In answer to Waddell's question, Garvey told us he had never released them in any way. There were other things said there at the time Waddell and I were there. I think I mentioned about the Paisley car and the Small car and my own car, which was supposed to be in this mortgage. Concerning those, I told Garvey I didn't see where I could hold this car, on account of the Paisley car and the Small car coming through that bank, and he says: 'I think you could.' I says, 'I think you have been paid for them,' or words to that effect, 'because you have accepted their notes.' At that particular time Garvey said that the cars had not been absolutely released, none of them. I filed suit against Smith on the two notes. * * * I took up the chattel mortgage from the Stockmen's National Bank on the Buick and Ford cars. I did that on the twenty-first day of January, 1918. Mr. Waddell and Mr. Kifer, the sheriff of this county at that time, were with me when that was done. At the time I paid for these two chattel mortgages, when Mr. Kifer and Mr. Waddell were there, Mr. Garvey made the remark that he didn't see how Smith was going to stay out of the pen, providing that these people that these cars was taken from would crowd him, unless they was his friends and just let him off; and also it was asked there in the presence of the four of us if he had ever given any consent to release

any of those cars in any way. In answer to that he said, 'No.' He was asked if he gave any authority to release any of those cars and gave Smith permission to sell any of them, and he said he absolutely did not.'' And further he testified: ''As to what I did towards taking over these Buick and Ford cars under the chattel mortgages, Mr. Kifer, Mr. Waddell and I went over there and gave them a check, after I had gone to Mr. Waddell and got the papers fixed up and turned them over to Mr. Kifer. What cars I got under the mortgage I think I put in the garage over here. Of the Ford and Buick cars mentioned in these two chattel mortgages, we got two cars, a Ford and a four-cylinder Buick. I guess it was two Fords and one Buick. The Buick was a four-cylinder Buick that Edgar Jones down the valley here had. Of the Ford cars described in the chattel mortgage, I recovered the Young and Luther cars under the chattel mortgage. I did not hold those cars and dispose of them and sell them. I held them for a little while is all. They replevined them and took them back. They brought suits against me.''

And as regards his connection with the bank and familiarity with its business and affairs, he testified on cross-examination: ''I can't say that I did anything at all on my own volition about the matters of the bank. I talked the matter over with Mr. Bowman and Mr. Garvey; Mr. Garvey more than Mr. Bowman. From month to month, as I attended the directors' meetings, I went over the various notes and discounts handled by the bank. Some of them I approved; some we would agree on; some we would not agree on. At any rate, I exercised my judgment on them. Then after September, 1917, along that year, the Smith notes came before the bank for consideration several times during the year. As to whether I inquired at any time as to the status of his financial condition, I would like to answer that so the jury and judge and all will understand. When we first was going to organize this bank, Mr. Smith goes to Mr. Garvey and wanted a loan, and I told Mr. Garvey not to let Mr. Smith go too far, and I says, 'Get security.'

Mr. Garvey was down here a month or six weeks before the bank opened up. He was making loans to other people besides Smith. If I remember right, when we opened the bank, Smith had something over $14,000 of notes, which he thought, when we got opened up and got these notes, because—he thought was $8,000, and Mr. Langworthy and Mr. Bowman jumped all over him about it, that he thought he had only $8,000, and come to find out he had about fourteen—about that, and they was after him to cut that down, until I took this up. I think I was a witness in my own behalf in the Luther case. I do not remember every word I testified about this same matter in the Luther case. Q. Didn't you testify there, in answer to a question of mine on cross-examination, that you were the cause of Mr. Smith getting started there at the Stockmen's National Bank and getting as much money as he did? A. I think I did—in this way—getting eight per cent money, but I told Mr. Garvey to get plenty of security for it. As to whether I testified (in the Luther case) in answer to the following questions by you 'Why were you so solicitous about asking whether he turned money in or not? A. If you want to know that, Mr. Enterline, I was the cause of Mr. Smith getting started there and getting as much money as he did,' I will say I might have swore to that. As to whether I will swear now that I didn't so testify, I wouldn't say. As to whether that is correct or not, I wouldn't say, but I will say now that I told Garvey to hold him down. I wouldn't say positively to the jury now that I didn't give that evidence. Q. Didn't you know before you purchased these notes that Smith was from time to time disposing of this mortgaged property?- A. Well, the Paisley car and the Small car and my own car, which it turned out that my own car wasn't mortgaged. As to whether you asked me the following question, and I made the following answer (in the case of *Luther* v. *Lee*): 'Q. Did you know, Mr. Lee, or didn't you know, that Mr. Smith from time to time was selling this mortgaged property? A. Oh, yes, sir. It is a cinch he was

selling it.' It is a cinch that he had sold some of it. I did not know that he was disposing of this mortgaged property from time to time, only what I have mentioned. In this particular bank case I knew that he had disposed of that. I did not know his financial condition exactly when I took him down to the Stockmen's National Bank. I did know that I was an indorser there on a note secured by a mortgage and that he had disposed of the property. I knew Mr. Smith three or four years before these transactions arose. He started in to build the garage in which he afterwards transacted his business, first in partnership with me, and then he couldn't keep up his end, and then I rented the garage to him. Until the 1st of November, 1917, he kept his cars and transacted his business at my garage. I kept my car in that garage. I was not there almost daily. At times I would be out of town for a week or ten days. When I came to town I would come to that garage. There is where he kept his Buick cars and the Ford cars and the Hupmobiles until November 1, 1917, all of which were mortgaged in the general transaction of this business. Any fool would know they were not keeping the cars just for exhibit. *As to whether I knew he was selling them in the general course of business, any fool would know that.* If a man paid cash for a car that was mortgaged, I supposed that Smith would turn in the cash. As to whether that was the arrangement, I couldn't say what arrangement Garvey had. I did not make any investigation then as a director and a member of these committees as to the financial situation. I quit taking my cars there or quit being on friendly terms with Smith on the 1st or 3d of November. He first went into the garage when it was first built; I think it was 1915; I wouldn't say when; the fall of 1915, I think. I could not say I was acquainted with his way of doing business from then to November. This note that I signed as an indorser in the First National Bank of Hardin, I knew that that was due six months after September 4, 1916, as it reads. Q. Let me understand. When you first had the conversation

with Garvey, whereby you made up your mind to bring this suit and pay the note of the First National Bank and take up these other notes, when was the first conversation had in reference to that? A. Well, that I really made up my mind to do it? Q. No, when you had the conversation with Garvey. A. Well, you said when was the first conversation I had and when. I would say the first conversation I had was four or five days before. We might have been up in Garvey's room. There wasn't a day that Garvey and I wasn't together going to eat, or something like that. My purpose in taking Waddell down there after I talked to Garvey was because he was my attorney. I wanted to take him down there because I wanted him and Garvey to talk it over. Q. And what was your purpose, you say, to have him tell it before Waddell, or what? A. That is to have him look over these papers—to have him look over the mortgage and one thing another. That was the purpose, for assigning them over to me. That is the reason that I took Waddell down there, and draw up the necessary papers for me—to take up the papers. That is what Garvey advised me to do—to take up the mortgage. That I would go and get Waddell is not the only thing I said. As to what else I said at that time when I went there before I brought Waddell down, we might have talked over some other business. It is true that, as I attended meetings from time to time after the bank was started, monthly meetings, notes were turned in by Smith on the sales of various cars that were mortgaged, and I was present at the meeting and approved them. I will have to say that I never had much to say about Smith's notes; just as I told Mr. Garvey not to let Smith go too far. I knew at all times, and before January 21, 1918, that Smith was doing business on borrowed money and mortgaging his stock from time to time to secure his indebtedness. He was doing business on borrowed money, but we had agreed at a directors' meeting some time before January not to carry him any more on borrowed money. I knew he was selling Hupmobiles and Buicks and Fords in the course of his business, and, I think,

Overlands. Q. You knew before you purchased these notes on January 21, 1918, that Smith was borrowing money from the Stockmen's National Bank and he would secure all those loans by mortgages on the cars that he was handling? A. Well, not all loans, I didn't know. I didn't know what cars. Q. As director of the bank, you never made any suggestion, did you, to take back any of these cars that were being sold by Smith, the mortgaged property? A. Just as I told you. The only three that was mentioned was my own and this here Paisley car and the Small car. The money was turned in when we approved those notes. Q. In the former trial, Mr. Lee, in the trial of the Luther case, in January of this year, didn't you testify that Garvey advised you that Smith had sold part of the mortgaged property? A. Yes, he advised me about this Paisley and Small car. I can't say that I testified that he advised me about any other, because I don't think he did. I can't say positively about that. Q. As to the record in that case (*Luther* v. *Lee*), on your cross-examination, as follows: 'Q. And you never made any inquiry before you bought the note? A. I never did, outside of talking to Mr. Garvey about it as I have said. Q. Then Mr. Garvey, cashier of the bank, advised you before you purchased the note, he had sold this mortgaged property, at least a part of it? A. Well, yes, sir, I knew of two of them he said was the Paisley and the Small car.' I think that is all right. And it is right that I never made any inquiry. The reason that I wanted Smith to get me off from the note at the First National Bank and the Merchants' National was not because Smith had sold all the property covered by the mortgages securing these notes. · His note was way past due, and really until Mr. Howe spoke to me about this, I supposed this one was taken up. I knew that they were secured by mortgages to the bank, but I supposed this one was taken up. I knew then that he disposed of this property covered by the mortgage securing these notes on which I was indorser to the Merchants' National and the First National Bank. Q. Now, calling your attention to page

59 of the record in your testimony that you gave in the Luther trial, the questions propounded to you by me on cross-examination at the trial and your answers: 'Q. Well, let me ask you this, Mr. Lee, when you bought this note in question prior to that, what investigation did you make as to what mortgagea property was still undisposed of under that mortgage? A. What mortgaged property was still undisposed of? Q. Yes. A. Well, now I cannot say that I made any. Q. You didn't make any investigation at all? A. No, sir; not of the mortgaged property—that wasn't disposed of or anything. Q. You knew at the time you bought (referring to one of the notes in suit here) some of it was disposed of? A. It is a cinch some had been disposed of. I talked to Mr. Garvey about it afterwards.' A. I did.

"By the Court: Did you so testify—that is the question. A. Well not in this case here now. I did so testify in the Luther case. Continuing quotation of the testimony on page 60 of the witness in the case of *Luther* v. *Lee:* 'Q. And at a meeting held before you bought that note, weren't Mr. Smith's financial conditions talked over and the fact disclosed he had sold a lot of this mortgaged property? A. Well, there was some, yes, sir. I think Mr. Garvey was authorized by some of the directors to make Mr. Smith pay this note. Q. And you knew then before you bought this note in question that Smith had disposed of a lot of the mortgaged property and the notes hadn't been paid, didn't you? A. I would not say "a lot." ' '

"Mr. Enterline: This is on page 60: 'Q. Didn't you know at all times yourself that Smith in the automobile business was disposing of mortgaged property? A. Well, not all the time; no, I didn't. Q. Didn't you know, Mr. Lee—in the first place you started, you and he, to build a building, and that fell through, didn't it? A. It never got much of a start. He fibbed to me a little bit, I guess. Q. So you knew his financial condition was such that he was doing business by borrowed money, secured by mortgages, did you? A. Yes, sir; he was

borrowing money, and Smith gave me the impression he had money. He always said he could get plenty of money. Q. He was still borrowing money? A. Any of us borrow money; I am at present myself.' I did not know it part of the time. After having to take up this note, I did. Referring to the meeting we had, in which Mr. Smith's financial condition was talked of, Mr. Richardson, one of the directors, did not tell me that he was my customer and that I would have to take it up. With reference to my claim of various items of damages, I have that list with me, I think. The first item which I gave was P. W. Young. That was paid out on compromise. One hundred and eighty-three dollars was paid to him on the compromise. That was after I was beat in the Luther case. Young had a Ford car. We learned that he had that Ford car. I will say some time in January—the last of January, 1918. Before I purchased the notes, I had not made any inquiry about that car that he had. Young lived about twelve miles north of Hardin. I knew him. I believe I learned that Young had one of these cars through Waddell looking it up and finding out where it went after we started this action. I suppose I could have found that out before I purchased the notes if I had made an investigation. The next item is Fraser Bros. They purchased a six-cylinder Buick, covered by one of the mortgages I introduced in evidence. That six-cylinder Buick was a touring car. I paid them $52.50. I had the sheriff go and take the car from their possession and the Fraser Bros. replevined it back. I paid that money out on a compromise with those parties. I knew the Fraser Bros. before I purchased these mortgages. As far as I know, they are reputable people. I suppose I could have found out where it was before I purchased the mortgage. I paid them $52.50. That was a Buick covered by one of the mortgages introduced in evidence here. The next item is Edgar Jones. He had purchased a Buick, four-cylinder. That was also one of the ones mentioned in this mortgage. I found out that he had that the same as the others. After Mr. Waddell started out, we found out where

we had these cars.  It was quite a little before we found out who had all these cars.  I said the last one was Edgar Jones, four-cylinder Buick.  The Fraser Bros. had a six-cylinder Buick.  Both of those were touring cars.  The last one I mentioned was Jones.  I knew Jones.  He is a citizen of this county.  He lives about ten or eleven miles north of here. All these parties that I have mentioned so far, all claim to have purchased this property from Tom Smith while he was engaged in the automobile business right here in this town. Of course, if I had conducted the investigation before I purchased these mortgages, I would have learned that fact.  Probably it would have taken me quite a while.  In that case, I paid $125.  That was in the way of compromise also.  The next one that I have down here—of course, that isn't paid yet—the Luther judgment.  Of course, I am charging that up to this man and I haven't paid it.  I had my lawyers argue a motion for a new trial in that case.  I don't know as my intention is to keep on fighting that case.  I don't know whether I am charged here with abusing him—sort of fining me in that case.  It may be that I was fined when I took the car away from the man, if that is the way you look at it, if that was the rule on which I was punished there.  I paid the sheriff $80 for going and getting these cars and one thing another mentioned in their expenses.  He got the cars mentioned in here.  He got the Small car.  That is not included in this.  He got the Paisley car.  That is not included in this. As to whether I sent him out after the Paisley car and the Small car, although as you remember my testimony, I told Garvey I could never get them—I told Garvey we couldn't hold them; that was my idea.  Still, I sent the sheriff out, since Mr. Garvey insisted we could.  I seemed to be under the domination of Garvey.  Q. Now, what else, what other cars did you find under this mortgage—I am referring now to the Buick mortgage—other than the two touring cars that you have mentioned?  A. What other cars under this mortgage?  Q. Yes.  A. Well, my car was supposed to be under

the mortgage. It is on, it is mentioned. My car, this Buick roadster, model E44, was my car. That is the description of my car which I bought. Come to find out, I bought the car before the mortgage was given. Q. Now, this note and mortgage were passed on by you as one of the directors, after it was given, at one of those meetings, was it not, before you bought it? A. Before I bought the car? Q. No, no, before you bought the mortgage. A. Yes, I did not, as one of the directors, pass upon Exhibit 'F' (the mortgage covering the Buick cars) in this case as all right, in which my car was described, and which I now say I purchased before the mortgage was given. As to whether or not it was rejected, there was quite a little talk about it. Mr. Garvey was notified by the directors to get after Smith and close in. We told him to get the money from Smith and make him cut down on the loan—words to that effect. I did not conduct an investigation as a director of that bank at any time as to the situation of the mortgage and the condition of the property, for I relied upon Mr. Garvey's statements."

John H. Kifer, a witness for the plaintiff, who occupied the position of sheriff in Big Horn county in 1918, testified, in part: "I recall a transaction that Mr. Lee had with reference to some chattel mortgages against a man named Thomas C. Smith. With regard to that transaction, I think I was present when any inquires were made as to the status of the property covered by the mortgages. As I recall it, it was the day that we took the mortgage up at the Stockmen's Bank. I don't think I talked with anybody at the Stockmen's National Bank, but I heard the conversation, I think, that was directed there with Waddell and Lee; I think was there. I think the conversation was had with Mr. Garvey. I heard something in that conversation that was said by Mr. Garvey, for instance. It was with reference to whether or not he gave Smith permission to dispose of any of the property, automobiles. I heard Mr. Garvey say, in response to that inquiry, that he had not. That is practically all, I believe, that I just

recall at this time of the conversation that was had at that time in my presence. As to whether I had anything at all to do with these mortgages until after this conversation, it was just about that time. I think I was possibly taking up the mortgage at that time, or near then. If you direct my attention to what, if anything, I did with reference to any of the property covered by these two chattel mortgages, I would state that I think it occurs to me that we made an attempt to get in possession of some of them. When I made the attempt, we had some luck, and some we didn't. Some of them wouldn't give them up. I found the property scattered throughout the county, and some of them we never did find.''

John L. Waddell, a witness for the plaintiff, testified, in part, as follows: ''I was in the law business in the month of January, 1918. I had something to do as the attorney of Mr. Lee with reference to some chattel mortgages owned by the Stockmen's National Bank in the month of January, 1918. I was present when some conversation was had between Mr. Lee and Mr. Garvey with reference to some chattel mortgages. If I remember correctly, the time when this conversation was had was the morning of January 21, 1918, in the Stockmen's National Bank in the town of Hardin. I recall who was present when that conversation was had. Mr. Garvey and Mr. Lee and myself were present. There was nobody else present right at that time. I know a man named Kifer who was sheriff at that time. As to whether he was present at that time, he was present at a second conversation that we had, and Mr. Kifer and Mr. Garvey and Mr. Lee and myself. As to what was said and what was done at that conversation, Mr. Lee had me prepare papers for an attachment against the property of Mr. Smith, and we checked up the items on the mortgages held by the Stockmen's National Bank and the Ballantine State Bank against property of Mr. Smith. That was in the first conversation. Mr. Lee was present. Mr. Garvey and I checked that over. As to how long after the first conversation the second conversation was had, it occurs to me that

was some time in the afternoon of the 21st of January, 1918. Mr. Garvey and Mr. Kifer and Mr. Lee and myself were present at that second conversation. As to what conversation was had at that time, Mr. Lee opened the conversation, I believe. Anyhow, he made the statement that we were going to attach, or that he was going to attach, the property of Smith, and that he was going to arrange to take up the mortgages held by the Stockmen's National and the Ballantine State Banks. He stated that to Garvey. Mr. Garvey immediately produced the bank's copy of the mortgage, and we began to go over the items, and I asked Mr. Garvey if permission had been given for the sale of those cars, and he said: 'No, only Smith must account to me for the purchase price before title could be secured.' That was not all of the conversation with reference to the mortgaged property. We then asked the amounts due, and a check was drawn." And on cross-examination, he testified as follows: "As to when I was employed by Mr. Lee to bring the attachment suit, with reference to January 21, it must have been a matter of a week or ten days, before that. That is, I was consulted about the matter a little before that. I was not consulted by Mr. Lee relative to an attachment suit against Mr. Smith a week or ten days before January 21; it was with reference to a foreclosure. I was consulted about bringing a suit about a week or ten days prior—somewhere about there — I don't just remember. I am not positive whether I had already drawn the papers and commenced the action before I went to the bank on January 21, 1918. I don't know what day the action was filed. I must have had out the attachment because we bought (brought) it under that Act of the legislature which provided that, after attachment writ was issued, we could then buy up the mortgaged property. It might have been filed that day, but it was surely filed before the second conversation when Mr. Kifer was present; but possibly it might not have been filed when we had the first conversation. In the course of that conversation—either the first or second—I asked Garvey as to whether he consented

to the selling of three of these particular cars, I think, as to whether he consented to sell to those particular individuals. As to whether Mr. Garvey told me that the arrangement was that any sales made by Smith, Smith was to account to the bank for the purchase price; he did not tell me in those words. As near as I can remember, it was that the purchase price must be accounted to Garvey. He didn't say that if that was done it would be satisfactory, but I judged from what he said. * * * I mentioned those particular individuals, but I knew as attorney for Lee that certain of those cars had passed out of the possession of the mortgagor at the second conversation. At the second conversation, we found out that some of those cars were not in the possession of the mortgagor. That was not before Lee paid the money. The second conversation was when I and Kifer and Lee went down there. I, as representing Mr. Lee, knew the importance of finding out what property was still covered by this mortgage, and I made no investigation other than the conversation we had with Mr. Garvey. I was on friendly terms with him, and am now, as far as I know. I did not go over to the garage and make any investigation before making this investigation. As to whether I could have found out if I had made the investigation just as the sheriff did, making attachments, I never made the practice to investigate those things myself. As to whether I knew the importance as a lawyer and man buying a mortgage, I relied entirely upon the statements of Mr. Garvey. My recollection is that the suit was filed before we purchased the notes, but there might have been a conversation or two before we filed the suit.''

The plaintiff then offered in evidence the testimony of C. T. Garvey, taken by deposition in the case of *John Luther* v. *Walter O. Lee et al.,* and four other cases then pending in the district court of Big Horn county. On direct examination he testified: ''After the taking of these three mortgages which have been testified to, and which are attached to the complaints which I have identified, I did not at any time give

to Thomas C. Smith any authority to sell any of the automobiles mentioned in any one or all of these chattel mortgages. I did not know that Thomas C. Smith ever sold to John Luther a four-cylinder, model T, Ford touring car, described in the complaint as car number 2220238. He never advised me at any time that he had sold that car to John Luther. Thomas Smith never advised me that he had sold to P. W. Young one Ford automobile numbered 2247443, included in the mortgage covering Ford automobiles, which I have heretofore identified. I never knew he sold that car to P. W. Young. Thomas C. Smith never told me that he had sold to Edgar Jones, one Buick automobile, touring car, model E35, frame 349296, motor 368667. I did not know, at any time prior to the sale of this note, that Thomas C. Smith had sold the cars just mentioned to John Luther, P. W. Young, and Edgar Jones. I never knew, prior to the sale of these three notes, 1, 2, and 3, to Walter O. Lee, by my bank, that that car had been sold to Gibbs. Prior to the time I sold the notes, Exhibit 1, 2, and 3, to Walter O. Lee under demand of the sheriff, as I testified, Thomas C. Smith had never told me of his having sold cars other than those described in the complaint, or answers, in the five present actions, that were covered by these three mortgages and mentioned in these complaints." Upon cross-examination he testified: "When I took the notes * * * which are also secured by chattel mortgages on automobiles handled by Mr. Smith in the conduct of his automobile business, I knew then, as cashier of the Stockmen's National Bank, he was from time to time disposing of the mortgaged property under the same agreement, and I consented to that, that is, on condition that he should turn in the proceeds to the bank. That was a private agreement between me and Mr. Smith; I acting as cashier of the Stockmen's National Bank, and Mr. Smith, of course, acting for himself. As to whether I gave my consent as cashier of the Stockmen's National Bank that he should from time to time dispose of the mortgaged property,

that is, sell it, but that he should turn the proceeds of the sales when he made them in to the bank, I would say cash sales were to be indorsed and the notes O. K.'d by me. With reference to these specific instances where the sales were made, he didn't come out and tell me he sold the cars to these fellows. Sure, I knew he sold them to somebody. They weren't there. As to whether I knew when I took all these chattel mortgages as cashier of the Stockmen's National Bank, and also as an officer of the Ballantine State Bank, at that time that the only way Smith had to pay would be to sell this mortgaged property, I would say these loans were not the full valuation. We didn't stake him the full amount of a carload of cars. I knew there is where he would get his money. He was in the automobile business, sure, to sell automobiles. Surely he could not take the merchandise over in one place and let them stand there doing nothing. Surely, I knew at the time on November 27, 1917, when he paid this $1,000 on note marked Exhibit 3, that he must have sold some cars to get that money. He must have sold some cars, but I didn't know what cars he was selling. Q. Every time he came in and paid any money, you accepted the money and didn't want to know what car he sold; but you were satisfied? A. Selling cars and indorsing it on the paper, that was all right. 1 made no objection. With reference to this particular mortgage introduced in evidence, I knew that Mr. Smith was going to sell these automobiles to various purchasers from time to time while the mortgage was in existence. I, as cashier of the bank, consented to him doing that. I consented as cashier on behalf of the bank to him selling these automobiles from time to time in due course of business, and that was our arrangement and understanding."

The foregoing synopsis constitutes the gist of all of the plaintiff's testimony offered in support of his complaint.

As defined in our statute, section 7480, Revised Codes of
[1, 2] 1921, "Actual fraud, within the meaning of this

chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; (2) The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; (3) The suppression of that which is true, by one having knowledge or belief of the fact; (4) A promise made without any intention of performing it; or, (5) Any other act fitted to deceive."

As to whether actual fraud has been practiced is a question of fact (sec. 7482, Rev. Codes 1921), and the burden of proof is upon the one who alleges it. (*Lindsay* v. *Kroeger,* 37 Mont. 231, 95 Pac. 839.)

In order to go to the jury the plaintiff must make out a *prima facie* case embracing the elements of actual fraud, *viz.:* (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity, or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) and his consequent and proximate injury. (26 C. J. 1062.)

"When it appears that a party, who claims to have been [3] deceived to his prejudice, has investigated for himself, or that the means were at hand to ascertain the truth * * * of any representations made to him, his reliance upon such representations made to him, however false they may have been, affords no ground of complaint." (*Grinrod* v. *Anglo-American Bond Co.,* 34 Mont. 169, 85 Pac. 891; *Power & Bros.* v. *Turner,* 37 Mont. 521, 97 Pac. 950; 26 C. J. 1149.)

"One cannot secure redress for fraud where he acted in reliance upon his own knowledge or judgment based upon independent investigation." (26 C. J. 1162.)

A judgment of nonsuit is proper where the plaintiff fails [4] to prove a case for the jury (sec. 9317, Rev. Codes 1921) ; and when no substantial evidence has been introduced by the party upon whom the burden rests, a question of law for decision by the court is presented. (*Brophy* v. *Idaho Produce & Provision Co.,* 31 Mont. 279, 78 Pac. 493; *Escallier* v. *Great Northern Ry. Co.,* 46 Mont. 238, Ann. Cas. 1914B, 468, 127 Pac. 458.)

In our opinion the district court properly granted a non- [5] suit, as the proof clearly establishes the fact that the plaintiff was in a position as favorable as the defendant to know the true situation and facts pertaining thereto. The plaintiff was the president of the defendant bank, one of its directors, and a member of its examining and discount committee. He was the cause of Smith doing business with the bank and obtaining as much money as he did. He knew that Smith was doing business on borrowed money, that Smith was selling automobiles in the course of trade, and that same were mortgaged. He had been indorser on Smith's notes, secured by mortgaged cars, which mortgaged property he knew was sold and disposed of by Smith, notwithstanding the mortgage. He was with Garvey constantly when in Hardin, visited with him, slept with him, ate with him, worked with him in the bank in connection with the conduct of the business of the bank, frequently discussed the condition of Smith's indebtedness and the mortgage security therefor. He rented the garage to Smith, used by him as his place of business, kept his car therein, and frequently visited Smith's garage. He himself bought a Buick car from Smith, which he thought was covered by chattel mortgage, allowing him a credit of $600 on rent due for the garage, paying him $700 cash, which cash he learned upon inquiry had not been turned into the bank. He knew of the sale of cars made by Smith to Small and Paisley, which cars were covered by chattel mortgages to the bank.

Since it is essential that the party to whom a misrepresentation is made should be deceived thereby, and believe it to be true, one can secure no redress for a misrepresentation, which he knew to be false, nor for failure to disclose facts which he knew to exist. If the representee knew the truth, it is obvious that he was neither deceived nor defrauded, and that any loss he may sustain is not traceable to the representations, but is in effect self-inflicted. The facts disclosed in this action present a case falling clearly within the rule of *caveat emptor* under the great weight of authority. The evidence was not sufficient to take the case to the jury. The weakness of plaintiff's position prompts the remark that just because one brings a lawsuit or appeals a case to this court is not indicative that either is meritorious. Under all of the evidence submitted, the plaintiff failed to prove his case, and in our opinion the nonsuit was properly granted.

The judgment and order are affirmed.

*Affirmed.*

ASSOCIATE JUSTICES COOPER and HOLLOWAY and HONORABLE ROY E. AYERS, District Judge, sitting in place of MR. JUSTICE REYNOLDS, disqualified, concur.

MR. CHIEF JUSTICE BRANTLY, being absent, takes no part in the foregoing opinion.

Rehearing denied June 19, 1922.