No. 81-67

IN THE SUPREME COURT OF THE STATE OF MONTANA

1982

---

MAXINE KRONE, et al.,

        Plaintiffs and Respondents,

   vs.

REX T. McCANN, DOROTHY G. McCANN
and SUPERIOR HOMES, INC.,

        Defendant and Appellant.

---

Appeal from: District Court of the Fourteenth Judicial District,
            In and for the County of Musselshell
            Honorable LeRoy L. McKinnon, Judge presiding.

Counsel of Record:

    For Appellant:

        Hibbs, Sweeney, Colberg, Jensen & Koessler,
         Billings, Montana
        William Jensen argued, Billings, Montana

    For Respondents:

        Craig Buehler argued, Montana Legal Services,
        Lewistown, Montana

---

           Submitted:  October 27, 1981

              Decided:  MAR 10 1982

Filed:  MAR 10 1982

*Thomas J. Kearney*
_____
                   Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal of an adverse judgment in a land contract action entered by the court sitting without a jury in the Fourteenth Judicial District, County of Musselshell.

Respondents brought this action to reform a contract for deed between the respondents and appellants, Superior Homes, Inc., its president, Rex T. McCann, and its secretary, Dorothy G. McCann. Appellants cross-claimed for damages arising out of the loss of use of a cabin located on the land sold and for exemplary damages for the respondents' dogs chasing cattle owned by the McCanns.

Trial was had by the court sitting without a jury from January 22 to January 24, 1980. The court entered judgment for the respondents, holding that overreaching by Rex McCann amounted to fraudulent practices, and the court reformed the contract for deed. The District Court also held that Rex McCann must reimburse the respondents for monies given to a third person who was recommended by McCann to build a house for the respondents. Lastly, the District Court granted Montana Legal Services, who represented the respondents, $10,000 as reasonable attorney fees. The McCanns and Superior Homes, Inc., appeal.

Maxine Krone is a widow with two sons in their early twenties. The McCanns are realtors doing business through Superior Homes, Inc., a corporation owned by the McCann family. Rex McCann is the president and major stockholder of Superior Homes and Dorothy McCann is the secretary-treasurer.

Bryan Krone first contacted the McCanns through an ad in the newspaper. On December 31, 1975, Rex McCann showed

-2-

the Krones several parcels of land in the Bull Mountains.

In mid-June of 1976 Rex McCann again showed the Krones parcels of land in the Bull Mountains. The testimony of the parties differed considerably as to what Rex McCann told the Krones about a sixty-acre parcel they were interested in buying. The District Court found that Rex McCann represented that the sixty-acre parcel had a cabin which he wanted to use for about three months until he fixed up another cabin on adjacent property. The District Court also found that Rex McCann represented that the property had three good wells, and that he would have it surveyed or furnish papers showing the boundaries. No tests were ever made of the waters from the wells. The District Court found, however, "that it appears that none of the wells furnish water suitable for human consumption although the one with the pump is satisfactory for stock water."

Maxine Krone testified that she would not have purchased the property if the cabin was not included in the transaction. Rex McCann testified that he never intended to sell the cabin with the land since he used it as a headquarters for his real estate business.

Maxine Krone decided to purchase the sixty-acre parcel and told McCann that she wanted to build a house for herself and her sons on the property. McCann recommended a man named Neal Warnes to build her house. The McCanns and Neal Warnes had a meeting with Maxine Krone at her house in Billings in mid-June, 1976. Discussions ensued concerning how much money Maxine Krone should try to get as a downpayment on her house in order to make the downpayment for the Bull Mountains property and to pay Warnes for beginning work

on a new house.

Maxine Krone testified that at the mid-June meeting she was unsure of whether to contract with Warnes to build her house. She stated that it was only upon Rex McCann's guarantee of Warnes' reliability that she agreed to hire Warnes. The District Court found that Rex McCann had assured the Krones that "he had a man, Mr. Warnes" and that Maxine Krone relied upon this assurance when she hired Warnes and advanced money to him.

Maxine Krone sold her home in Billings and on July 15 signed a buy-sell agreement for the Bull Mountains land that contained the cabin and three wells. The buy-sell agreement contains a paragraph in which seller, McCann, made several reservations. The pertinent section follows:

> "Subject to reservations, easements for egress and ingress and utilities of record, and reserving to the seller an easement for ingress and egress and utilities to the existing cabin and over and across to reach other properties. The seller retains the grass and grazing privileages [sic] untill [sic] the land is fenced and used for agricultural or grazing purposes. By installing a water tank near the boundy [sic], installing a motor on the existing pump and paying for the electricity, the seller may use the water from said well."

Maxine Krone claims that the above paragraph was not contained in the buy-sell agreement when she signed it on July 15, 1976.

Rex McCann signed the buy-sell on July 15 as sales representative for Superior Homes, Inc. On July 20, Dorothy McCann and Rex McCann signed as sellers. The District Court made no findings of fact as to the buy-sell agreement.

After signing the buy-sell agreement, Maxine Krone, using U-Haul trailers, moved her belongings to the Bull

-4-

Mountains property. She discovered that Neal Warnes had done nothing toward the construction of her house except dig a hole for the foundation. Needing a place to store her belongings, she asked Warnes to build her a barn, which he did with the use of salvaged lumber.

The storage shed or barn was the extent of the work done by Neal Warnes for Maxine Krone in the summer of 1976. Maxine Krone paid Warnes and a person he employed a total of $3,450.15. Thereafter, Krone went to the McCanns asking them to get Warnes to work on her house. After these discussions with McCanns, Warnes would call Krone several times to assure her he would get busy building her house.

Warnes disappeared in September 1976, and Maxine Krone brought suit against him. He defaulted but Maxine Krone was never reimbursed for the money she paid to him since Warnes was judgment proof.

The District Court found that Rex McCann had an interest in Krone's agreement with Warnes because their agreement made it feasible for the Krones to purchase the land. Because of McCann's assurances and the benefit he received from the agreement between Warnes and Maxine Krone, and because Krone relied on McCann's assurances, the District Court found Rex McCann personally liable for the $3,450 Krone had paid to Warnes.

A contract for deed was signed by the Krones and the McCanns on August 21, 1976, for the sale of the Bull Mountains land. The Krones maintain that the signing took place at the cabin, that they read a contract for deed and signed it. Then, Rex McCann gave them two more contracts which they signed, thinking they were copies of the first

contract they read. The Krones also claim that they did not receive a copy of the contract until September 24, 1976. The Krones say that they did not look at the contract in September because they thought it was the one they had already read.

The McCanns claim that the signing took place at their realty office in Billings, in the presence of the notary public whose name is on the contract. The McCanns also claim that a copy of the contract was given to the Krones at that time.

The District Court concluded that the proof was insufficient to draw any conclusions as to place or circumstances surrounding the signing of the contract.

The Krones stayed in the cabin on the Bull Mountains land until the first part of November when they purchased a mobile home. They did not use the wells for drinking water since it _appeared_ that the water was unfit for human consumption. The wells were never tested for purity.

In the spring of 1977, cattle were brought to the sixty-acre tract by a man named Alexander who said he had bought the grazing rights to the land from Rex McCann. The Krones tried to prevent Alexander from grazing his cattle on the land and chased the cows away from their mobile home. At this time they contacted Rex McCann about the grazing right, and they were told to read their contract.

When they read their contract, they believed it was not the agreement they had signed. The District Court found that they then discovered for the first time that the seller had reserved all grazing until the property was fenced, reserved use of the only well in operation for stock water,

-6-

and ownership of the cabin. The Krones maintain that they did not know of these reservations until the spring of 1977 and believed that they had purchased the cabin with the land.

The District Court concluded that Rex McCann's actions were "overreaching" and amounted to fraudulent practices. The contract for deed was reformed by the court to exclude all reservations made by the McCanns. The McCanns were ordered to provide useable water from one of the wells, and their use of the cabin was limited to three months. Rex McCann was required to reimburse Maxine Krone for the monies advanced to Warnes. The respondents were required to pay for the cost of a survey to establish boundaries. Finally, the McCanns and Superior Homes were required to pay a reasonable attorney fee to Montana Legal Services of $10,000.

While appellants raise six issues for review, a discussion of the two main issues resolves this case. The main issue is simply whether there is substantial credible evidence to support the District Court's findings that Rex McCann made certain representations and such representations amounted to fraud. The second issue is whether the McCanns should be liable for the monies Maxine Krone paid to Neal Warnes.

Since there is not substantial evidence to support a finding of fraud and since there is nothing on the record to show a partnership by estoppel between Rex McCann and Neal Warnes, the judgment of the District Court must be reversed.

The appellants confront the fraud issue by arguing that the admission of parol evidence by the District Court

was error since fraud was not successfully proven. The respondents maintain that it is the prerogative of the fact-finder to decide the existence of the misrepresentations and fraud, and that such findings must be upheld on appeal since they are supported by substantial evidence.

The appellants' objection to the use of parol evidence could be resolved rather easily by looking to the language of section 28-2-905(2), MCA, which provides that there can be no parol evidence of the terms of an agreement between the parties except: "to establish illegality or fraud." Here, the oral representations of Rex McCann were used to establish overreaching or fraud.

There remains, however, the basic question: Was there substantial evidence to support the finding of fraud? We have emphasized in the past that it is the province of the District Court to determine whether fraud has been perpetrated on an innocent purchaser. "The District Court is in the best position to weigh the factors involved, assess the credibility of witnesses . . ." Dolson Co. v. Imperial Cattle Co. (1981), ___ Mont. ___, 624 P.2d 993, 996, 38 St.Rep. 306, 310. We have also noted the difficulty in showing fraud, since it cannot be proven easily by direct evidence. See Montana Nat'l Bank v. Michels (1981), ___ Mont. ___, 631 P.2d 1260, 38 St.Rep. 334.

We have further emphasized that the evidence presented must support findings by the District Court of the following nine requisite elements of fraud:

"1. A representation;

"2. Falsity of the representation;

"3. Materiality of the representation;

"4. Speaker's knowledge of the falsity of the representation or ignorance of its truth;

"5. Speaker's intent it should be relied upon;

"6. The hearer's ignorance of the falsity of the representation;

"7. The hearer's reliance on the representation;

"8. The hearer's right to rely on the representation; and

"9. Consequent and proximate injury caused by the reliance on the representation." Van Ettinger v. Pappin (1978), 180 Mont. 1, 588 P.2d 988, 994, 35 St.Rep. 1956, 1961, and cases cited therein.

Here, giving all legal presumptions to the District Court, we fail to find substantial credible evidence of these elements present in the record. Clearly we could not reverse the District Court on this issue unless there is a clear preponderance of the evidence against the court's findings. Spencer v. Robertson (1968), 151 Mont. 507, 445 P.2d 48; Smith v. Krutar (1969), 153 Mont. 325, 457 P.2d 459. Here, the preponderance of the evidence does not support a finding of fraud.

In Cowan v. Westland Realty Company (1973), 162 Mont. 379, 512 P.2d 714, after looking carefully at the record, we found that indeed a certain representation was not made by the defendant. In Cowan we noted that fraud can never be presumed, but must be proved by a preponderance of the evidence. "Good faith will always be presumed and mere suspicion of fraud is not sufficient." Cowan, 512 P.2d at 716, citing Reilly v. Maw (1965), 146 Mont. 145, 405 P.2d 440.

Here, McCann was found to have made the representations that the property had three good wells, a cabin, and

that he would either have the property surveyed or furnish papers showing the boundaries.

The wells have <u>never been tested</u>. There is no showing on the record that McCann's representation that the wells were "good" was false. It was only shown that just one well had a pump and the others did not.

Maxine Krone testified that she thought the cabin was transferred to them with the purchase of the property. She would have believed she owned the cabin as of August 26, 1976, when she purportedly read a contract for deed different from the one in evidence. However, on October 6, 1976, in a verified complaint, Maxine Krone stated: ". . . the plaintiff [Maxine Krone] moved her belongings from the home being rented by her in Billings, Montana, and resided in a cabin <u>owned by the said Rex McCann</u>; that said cabin was not large enough to fully accommodate all of the belongings owned by the plaintiffs." Maxine Krone, on October 6, 1976, six weeks after the closing on the property, swore that the cabin was Rex McCann's--<u>this was not discussed by the District Court</u>. However, this goes directly to the question of the purported representation by Rex McCann during contract negotiations.

Lastly, Rex McCann was found to have represented that he would furnish papers showing the boundaries of the land. The respondents do not claim that this was the representation made; rather, respondents claim that McCann represented that the fences were the boundaries. In Van Ettinger v. Pappin, supra, we stated:

> "'When it appears that a party, who claims to have been deceived to his prejudice, has <u>investigated for himself</u> or that the means were at hand to ascertain the truth . . . of

-10-

> any representations made to him, his reliance
> upon such representations made to him,
> <u>however false they may have been</u>, affords no
> ground of complaint. . .'" 588 P.2d at 994,
> quoting Lee v. Stockmen's Nat'l Bank (1922),
> 63 Mont. 262, 284, 207 P. ~~627~~, 630. (Cita-
> tions omitted.)                     623

Here, the Krones could have easily tested the wells, or seen that there were not pumps on two of the three wells. Also, the Krones could have discovered the actual boundaries of their land by looking to a 1972 survey, or talking to a neighbor, Mrs. Ollis, who knew the actual boundary was not the fence line.

The record, therefore, does not support the conclusion by the District Court that McCann's representations amounted to fraud.

The second issue of whether Rex McCann should be held liable for the monies Maxine Krone paid to Neal Warnes can be discussed summarily since there is nothing in the record to show a partnership by estoppel between Rex McCann and Neal Warnes. The only facts in the record which are claimed to give rise to a partnership by estoppel were: (1) McCann said he knew of a person who could build a house for Krones; (2) McCann introduced Maxine Krone to Warnes; (3) McCann and Warnes discussed at Krone's house how much downpayment she should try to get for selling her house in order to make the downpayment for the land and pay Warnes his initial money; (4) McCann said Warnes was reliable; and (5) Warnes was going to build a greenhouse for the McCanns.

These facts are insufficient to establish a partnership by estoppel under section 35-10-308, MCA. There was neither the representation that Warnes worked "as a partner in an existing partnership" with McCann, nor can that

inference be drawn from the record.

As this discussion indicates, we are unable to find substantial credible evidence of fraud or any evidence of the kind to render the McCanns liable in the defaulted transaction between the Krones and Neal Warnes.

The judgment of the District Court is reversed, and the cause is remanded to the District Court to establish attorney fees and costs to the prevailing party.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices

-12-

Justice John C. Sheehy, dissenting:

I dissent. I would affirm the award of damages except that I would not hold the defendants chargeable with the Waarnes charges in connection with home construction, and I would reduce the attorney fees by one-half.

_____
                    Justice